[No. S004422. Crim. No. 22485. June 10, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS JAIME AVENA, Defendant and Appellant.

**COUNSEL**

Eleanor M. Kraft, under appointment by the Supreme Court, Nudell & Allen, Karen Nudell, Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky, Michael J. Lightfoot and John P. Martin for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William R. Weisman, Marc E. Turchin, Susan Lee Frierson and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—Carlos Jaime Avena was convicted in 1980 in Los Angeles County Superior Court of the first degree murders of Manuel Solis and Miguel Vasquez. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) Multiple-murder and robbery-murder special-circumstance allegations were also sustained. (§ 190.2, subd. (a)(3) & (17).) In addition, petitioner was convicted of robbery, attempted robbery, two counts of assault with a deadly weapon, and two counts of assault with intent to commit murder. (§§ 211, 664/211, 245, subd. (a), and former § 217.) The jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

While the appeal in this matter was pending, defendant filed a petition for a writ of habeas corpus. We thereafter issued an order to show cause and appointed a referee to take evidence on the question of possible ineffective assistance of trial counsel with regard to defendant's alleged use of phencyclidine (PCP) on the night of the crimes. The appeal was held in abeyance while the habeas corpus matter proceeded. We have since determined that defendant did not establish he was under the influence of PCP on the night in question, and did not otherwise demonstrate he is entitled to relief on habeas corpus. (*In re Avena* (1996) 12 Cal.4th 694 [49 Cal.Rptr.2d 413, 909 P.2d 1017] (hereafter *Avena I*).) We therefore proceed to address the issues defendant raises on direct appeal.

After due consideration of these claims, we vacate one special circumstance finding, but otherwise affirm the guilt and penalty judgments in their entirety.

### Facts

#### A. Guilt Phase

The facts adduced at the guilt phase of the trial are adequately set forth in *Avena I, supra:* "On September 12, 1980, petitioner and brothers Victor and Arturo Padua were driving in a white 1971 Mazda. Petitioner sat in the backseat and had a .22-caliber rifle with him. All three had consumed some beer that evening. While waiting for a stoplight, a brown Ford Galaxy pulled alongside them. When Arturo Padua yelled an insult at the brown car, one of its occupants threw a beer bottle at them, striking the Mazda on the window where petitioner was seated. Petitioner retaliated by shooting at the Ford, which then sped off.

"Petitioner and the Paduas gave chase. The Ford stopped suddenly, causing petitioner's Mazda to collide with the rear of the Ford. The Ford again

drove away; the Mazda, however, was rendered inoperable. Petitioner and the Paduas pushed it to the side of the road and decided to secure alternative transportation. It was then they saw a pink Chevrolet Camaro, driven by victims Manuel Solis and Miguel Vasquez. Petitioner and the Padua brothers approached the Camaro and stood on either side of the car. Petitioner was carrying his rifle and Arturo was carrying a piece of wood. Although the exact sequence of events is unclear, petitioner apparently demanded the driver give him his money and the keys to the Camaro. Petitioner then shot into the car, wounding the occupants. Petitioner also apparently grabbed one of the victims, pulled him out of the car, and shot him four times in the chest. The other victim exited the passenger side of the Camaro whereupon Arturo struck him in the head with the piece of wood. When one of the victims made a vain attempt to flee, petitioner told Arturo to move out of his line of sight, and then he shot the victim twice. Some people on the street, including the victim's brother, Daniel Solis, witnessing this crime, engaged in some sort of confrontation that included throwing a bottle. The witnesses fled when petitioner began shooting at them. Petitioner and the Paduas then left in the pink Camaro.

"Once in the car, petitioner said he was out of ammunition and needed to go home and reload. After reloading, the trio drove the Camaro to a church parking lot, where they set the car on fire, apparently to eliminate their fingerprints. They then walked to 22nd Street and Normandie, near the Santa Monica Freeway. The Paduas went to buy more beer and then returned to petitioner. By this time, it was approximately 11 p.m., and the trio was once again on foot.

"Victor Padua, apparently having had enough excitement for one night, hid in some bushes near a freeway exit. When victim Ana Hernandez stopped her yellow Chevette at a stoplight, petitioner and Arturo walked up to either side of the car and attempted to open her door. Petitioner shot into the car door; Arturo may have slammed a beer bottle on the windshield. Hernandez accelerated through the red light to escape; petitioner shot at the escaping Chevette, striking the rear of the vehicle.

"Officers McCann and Derenia were coincidentally driving by the off-ramp in an unmarked police car at this time and observed the yellow Chevette drive through the red light. They then saw petitioner standing in the off-ramp with the rifle. Petitioner opened fire on the officers, shooting out the car windows. The officers returned fire, both emptying their revolvers before driving under the freeway, making a U-turn, and returning. Petitioner and Arturo fled on foot, managing to escape capture. A police search of the area revealed several .22-caliber casings on the ground and, eventually, Victor Padua, still hiding in the bushes.

"Police initially did not connect Victor to the shootings, as he gave a false story. Finding evidence that Victor had been seen in the company of two other men that night, police questioned him again and this time he told police about petitioner and Arturo. They were arrested and identified by Officers McCann and Derenia. The witnesses of the Solis and Vasquez murders confirmed the shootings, but were too far away to make positive identifications. Hernandez likewise said it was too dark to make a positive identification of her assailants.

"Victor Padua testified against petitioner at his trial. In addition, petitioner gave a statement to police that was surreptitiously recorded. This statement largely tracked Victor's account of the crimes, except that petitioner claimed the driver of the pink Camaro menaced him with a knife and that was why he shot him. The recording was played for the jury.

"Petitioner also admitted he used a .22-caliber rifle that was loaded by means of a tubular magazine with a capacity of 17 to 20 rounds. He said he bought the rifle on the street for $30. A police expert testified that the .22-caliber shell casings found at the murder scene and on the off-ramp were, with one exception, fired from the same gun. The expert testified that only three types of rifles could have produced those shell casings. One type, the Marlin Glenfield, was described as a 'very common, very popular . . . very low priced [rifle]' that uses a tubular magazine with an 18-round capacity. (One shell casing exhibited characteristics that made it impossible to determine with certainty that it came from the same weapon.)

"Petitioner's trial counsel, Marvin Part, waived his opening statement and rested without presenting any defense at the guilt phase of the trial." (*Avena I, supra*, 12 Cal.4th at pp. 704-706.)

### B. Penalty Phase

The prosecution's case in aggravation consisted of evidence of three violent incidents.

#### 1. The January 1978 Shooting

In January 1978, victim Carlos De Santiago was standing on a Los Angeles street corner with some members of the "Harpys" street gang. As a car drove by, a man with a shotgun jumped from the car and opened fire. De Santiago was hit in the neck, but could not identify the assailant. Defendant was later arrested for the shooting; he admitted he fired the shots in retaliation, claiming some Harpys had shot into his parents' house and had broken his car windshield. Defendant was then 17 years old.

## 2. *The September 1981 Jailhouse Murder*

In September 1981, while defendant was in pretrial detention for the offenses for which he was eventually convicted and sentenced to death, deputies noticed a commotion while prisoners were returning from lunch. Deputy Oki, who was in a caged security area, observed defendant stabbing another inmate, Ruben Alfaro, with a jail-made knife called a shank. Alfaro was lying with his back on the floor and defendant stabbed him three or four times in the chest. Another inmate, Jesus Gonzalez, was also stabbing Alfaro. Oki was only four or five feet from the altercation.

Deputy Minnis was Oki's partner, and he also observed the attack. He specifically noticed the blood-covered shank in defendant's hand. When Minnis yelled out, defendant and Gonzalez fled; defendant discarded the shank. Minnis detained defendant, and it was later discovered defendant was wearing a towel wrapped around his midsection, a known protective tactic used by jail inmates who anticipate participating in a knife fight. Gonzalez was detained by Deputy Baylis, who had observed Gonzalez running from the scene; Gonzalez later admitted ownership of a long shank found near the knife attack.

Alfaro died from his wounds. An autopsy revealed the cause of death was blood loss due to multiple stab wounds. The stab wounds were consistent with defendant's shank.

Two days before the Alfaro homicide, Deputy Bauder saw defendant leave the dayroom and noticed that he bore several fresh superficial wounds on his left temple, neck and chest. Defendant told Bauder that an unidentified "black guy had tried to get him." A search of the dayroom turned up 5 shanks, but no witnesses among the 80 or 90 inmates present.

## 3. *The November 1981 Assault*

On November 5, 1981, Deputy De Leon was attempting to remove handcuffs from some prisoners. Defendant, whom De Leon did not recognize, attempted to walk between De Leon and the prisoners. When De Leon asked defendant what he was doing, defendant did not answer. A few seconds later, defendant again stepped between De Leon and the handcuffed prisoners. At this point, De Leon stopped trying to uncuff the prisoners and directed defendant to enter a cell. Defendant began to comply, but suddenly wheeled and attempted to strike De Leon in the face with a closed fist. A full-fledged fight ensued, with Deputy Mushinki joining in to subdue defendant. During the fight, defendant tried to bite De Leon in the groin area.

Defense counsel called only two minor witnesses at the penalty phase of the trial.

### DISCUSSION

#### A. *Guilt Phase Issues*

##### 1. *Denial of a Representative Jury*

■ Defendant first contends that excusal of 11 jurors who stated they could not vote for the death penalty under any circumstances violated his rights to both a representative and an unbiased jury, as guaranteed by the state and federal Constitutions. The claims lack merit. We have held that excusing such jurors does not violate a defendant's right to a representative jury (*People* v. *Thompson* (1990) 50 Cal.3d 134, 157 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1165 [259 Cal.Rptr. 701, 774 P.2d 730]), and the United States Supreme Court has also so held (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]). We have also held that excusing jurors unable or unwilling to vote for the death penalty under any circumstances does not compromise the constitutional right to an unbiased jury. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 975 [251 Cal.Rptr. 278, 760 P.2d 475]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) Because we have adopted the high court's formulation for excusing jurors in capital cases as set forth *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (see, e.g., *People* v. *Hamilton, supra,* at p. 1165), we apply the same analysis to these two issues (unrepresentative jury, biased jury) under both the state and federal Constitutions.

Defendant's initial opening brief was filed before the decision in *Lockhart* v. *McCree, supra,* 476 U.S. 162, was filed. Because his supplemental briefs do not provide any further argument why the authority cited above is wrong, we will adhere to those cases and reject his first argument.

##### 2. *Limitation on Voir Dire*

■ The record reveals the trial court asked each prospective juror in camera his or her views on the death penalty, apparently attempting to comply with the directives of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the high court precedent that applied at that time. (See *Wainwright* v. *Witt, supra,* 469 U.S. 412 [superseding *Witherspoon*]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 129-130 [5 Cal.Rptr.2d 796, 825 P.2d 781] [applying *Witt* in California] (hereafter *Hardy*).) Although the

record is unclear, we assume the trial court undertook this procedure in response to this court's views in *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pages 71-75, requiring sequestered voir dire due to the potential bias that may result from the process of death-qualifying prospective jurors. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1081 et seq. [259 Cal.Rptr. 630, 774 P.2d 659] (hereafter *Bittaker*).)

Defendant now contends that because the trial court, and not defense counsel, conducted the primary voir dire inquiry, this procedure violated his constitutional right to an impartial jury, because it limited counsel's ability adequately to question the prospective jurors. As a threshold matter, we note defendant failed to object to the procedure, thereby waiving the issue for appeal. (See *People* v. *Caro* (1988) 46 Cal.3d 1035, 1047 [251 Cal.Rptr. 757, 761 P.2d 680].) Defendant argues we should overlook the lack of an objection, claiming that counsel was constitutionally ineffective for failing to object. Counsel, however, may have had a tactical reason for agreeing to a voir dire procedure aimed at protecting defendant's right to a fair trial. (*Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, 71-75.) In any event, defendant's failure to demonstrate any prejudice precludes our finding counsel was ineffective on this record.

Defendant further argues we should overlook his failure to object because the trial court bore the ultimate responsibility to ensure he received a fair and impartial jury. In support, he cites *Rosales-Lopez* v. *United States* (1981) 451 U.S. 182, 189 [68 L.Ed.2d 22, 29, 101 S.Ct. 1629] (hereafter *Rosales-Lopez*). That case is inapposite. Although *Rosales-Lopez* states that the "obligation to impanel an impartial jury lies in the first instance with the trial judge" (*ibid.*), that decision does not undermine the California rule requiring a timely objection to preserve an issue for appeal. Indeed, aside from the situation involving racial discrimination, the *Rosales-Lopez* opinion concerns the high court's supervisory powers over the lower federal courts, not constitutional imperatives. (*Id.* at pp. 190-192 [68 L.Ed.2d at pp. 29-31].) We thus reject the suggestion that *Rosales-Lopez* excuses defendant's failure to make a timely objection to the trial court's voir dire procedure.

Even assuming for argument that the issue was preserved for appellate review, however, the record does not support defendant's claim of error. The record reveals that if a juror gave equivocal answers, the trial court permitted both defense counsel and the prosecutor to ask follow-up questions. This was thus not a case in which the trial court reserved voir dire for itself. (Cf. *Bittaker, supra,* 48 Cal.3d at p. 1083.) Moreover, defendant identifies no prejudice flowing from the procedure; that is, he fails to establish that a juror who eventually served was biased. (*Bittaker, supra,* at pp. 1086-1087 [rejecting a per se reversal test].) We thus reject the claim.

### 3. *Instruction on Diminished Capacity*

Defendant contends there was substantial evidence he was intoxicated and the court therefore erred in refusing to give his requested diminished capacity instruction. We agree with the trial court the evidence in the record was insufficient to support such an instruction.

"Although the defense of diminished capacity is now abolished (*People* v. *Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588]; Pen. Code, §§ 25, 28; see generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, §§ 208-211, pp. 238-243), it was extant when petitioner committed his crimes. 'Diminished capacity [was] a defense to all specific intent crimes.' (*People* v. *Cruz* (1980) 26 Cal.3d 233, 242 [162 Cal.Rptr. 1, 605 P.2d 830].) It provided that 'A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, *or intoxication*, and in such a case his killing, unless justified or excused, is voluntary manslaughter.' (*People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911], italics added.)" (*Avena I*, *supra*, 12 Cal.4th at pp. 722-723.)

The rejection of a diminished capacity instruction is error only if there is substantial evidence supporting the defense, i.e., evidence from which a reasonable juror could conclude that defendant's mental capacity was so reduced or impaired as to negate the required criminal intent. (*People* v. *Flannel* (1979) 25 Cal. 3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1.) The particular facts of this case show the People proceeded on a felony-murder theory only. Thus, defendant's entitlement to the instruction hinges on the sufficiency of the evidence showing that as a result of mental disease, defect, or—in this case—intoxication, he was unable to entertain *the intent to rob*, i.e., to permanently deprive the victims of the pink Camaro. (See *People* v. *Turner* (1984) 37 Cal.3d 302, 326 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another point, *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306].)

We conclude there was no substantial evidence showing defendant's capacity was significantly diminished in this respect. Victor Padua testified that after he, his brother Arturo, and defendant left work at the body shop at 6 p.m. on the night of the murders, they stopped at a liquor store and bought some beer. They then dropped off defendant at his home and continued to their house. Later, after a meal, the Padua brothers "had a couple more beers," but there is no evidence how much defendant drank. Around 9:30

p.m., defendant called to ask for a ride to the hospital to pick up his wife. The Padua brothers agreed; by this time, Victor testified he had drunk "about maybe six or eight beers," but there is no indication whether defendant had been drinking as well.

When the Paduas arrived at defendant's home, he was not yet ready to go, so Victor went to buy more beer, purchasing three 16-ounce cans. When the three men drove off, Victor gave both Arturo and defendant one can of beer, keeping one for himself.

The only other evidence relating to defendant's alleged intoxication was elicited on cross-examination of Officer Kellenberger, to whom defendant talked at the police station following the murders. When Kellenberger asked defendant where he and the Paduas were going when they left his house, defendant replied, "I don't know, man. We were so drunk." Victor Padua had maintained, however, that he (Victor) did not feel the effect of the alcohol.

This evidence is too weak and insubstantial to justify a diminished capacity instruction. First, we have affirmed refusals to give a diminished capacity instruction when the evidence of intoxication was substantially stronger. For example, in *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], the evidence showed the defendant had shared a pint bottle of brandy with someone in the early evening, then later consumed two mixed drinks during the course of the evening. In addition, the defendant snorted three lines of cocaine. He testified he was "under the influence" but not "drunk or overly drunk or high on cocaine." (*Id.* at p. 762.) We concluded this evidence "lent only minimal and insubstantial support to appellant's theory of diminished capacity from intoxication and therefore was not sufficient to justify the requested instruction." (*Ibid.*) It is manifest that defendant's showing of intoxication, which was even less extensive than in *Rodriguez, supra*, also did not justify the requested instruction.

A second reason why we reject defendant's claim is the lack of any evidence showing the effect of the alcohol on him. "Normally, merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction on diminished capacity. [Citations.]" (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1241 [278 Cal.Rptr. 640, 805 P.2d 899].)

Because defendant failed to introduce substantial evidence of diminished capacity, the trial court's rejection of the requested instruction was proper.[1] Accordingly, we also conclude the court's refusal to deliver the instruction did not undermine the reliability of the factfinding process in violation of defendant's right to due process under the 14th Amendment.

### 4. *Instruction on Assault With Intent to Commit Murder*

■ The trial court instructed the jury that defendant was not guilty of assault with intent to commit murder (former § 217)[2] unless he acted with the specific intent to murder the victim. Previous instructions, however, defined murder as requiring either express or implied malice. Implied malice was defined as: "when the killing is the direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, such as robbery." Defendant contends these instructions were erroneous because they could have permitted the jury to convict him of assault with intent to commit murder when only implied malice was shown. We find no error.

The jury was instructed: "Every person who assaults another with the specific intent to commit murder is guilty of the crime of assault to commit murder. [¶] In order to prove the commission of the crime of assault to commit murder, each of the following elements must be proved: [¶] One, that a person was assaulted; [¶] And two, that the assault was made *with the specific intent to murder* such person." (Italics added.) As we have explained in previous cases, giving this instruction was potentially confusing, because the applicable mental state for a violation of former section 217 is the specific intent *to kill*, not *to murder*. (*People v. Coleman* (1989) 48 Cal.3d 112, 138 [255 Cal.Rptr. 813, 768 P.2d 32] (hereafter *Coleman*); see also

---

[1] Defendant also relies on the fact the prosecutor at one point evidently agreed with defense counsel that the evidence warranted giving the instruction. The argument is unpersuasive. First, the prosecutor's comments on this topic were noncommittal. He initially said he had no comment, adding, "I think it would be appropriate based on the evidence to give the instruction." When the trial court indicated it would not give the requested instruction, the prosecutor responded: "We would agree with that, Your Honor."

Second, even assuming the trial court understood the prosecutor as clearly supporting the instruction at one point, this fact is not relevant. The propriety of the court's ruling turns on whether substantial evidence was introduced to warrant a diminished capacity defense, not on the prosecutor's opinion on that topic. If, as here, no substantial evidence supported the instruction, the prosecutor's mistaken belief to the contrary would not bind the court.

[2] The Legislature repealed section 217 effective January 1981, after several judicial decisions pointed out that assault with intent to commit murder is but one form of attempted murder. (See, e.g., *People v. Murtishaw* (1981) 29 Cal.3d 733, 762, fn. 24 [175 Cal.Rptr. 738, 631 P.2d 446]; Stats. 1980, ch. 300, § 2, p. 628.)

*People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752] [same for crime of attempted murder].)

As in *Coleman, supra,* however, we find the "instructions could not have been so understood." (48 Cal.3d at p. 139; see *Boyde* v. *California* (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 329, 110 S.Ct. 1190] [for ambiguous instructions, test is whether there is a "reasonable likelihood" the jury misunderstood and misapplied the instruction]; see also *Estelle* v. *McGuire* (1991) 502 U.S. 62, 72 & fn. 4 [116 L.Ed.2d 385, 399, 112 S.Ct. 475] [same].) First, the instructions did not clearly and directly inform the jury a conviction of violating former section 217 could be based on a finding of implied malice. Although such an interpretation could be teased out of the instructions given, it was not obvious. "The proper instruction that one can be guilty of *murder* on the basis of implied malice not involving an intent to kill, did not state or imply that one could be guilty of a crime which requires a specific *intent* to *commit* murder without intending to kill." (*Coleman, supra,* 48 Cal.3d at pp. 139-140, italics in original.)

Also as in *Coleman,* "[n]othing in counsel's final arguments at the guilt phase misled the jury to the contrary." (48 Cal.3d at p. 140.) The prosecutor, in his closing argument, emphasized the need to find intent to kill as opposed to the intent to murder: "[T]he clear intent was *to kill* those people and not just to shoot at them or scare them." (Italics added.) In his closing argument, defense counsel discussed the assault on Ana Hernandez by emphasizing that defendant shot into the door of her car, noting that "[defendant] could have shot right through the window *and killed her*" but that he did not, and he was thus not guilty of assault with the intent to commit murder. (Italics added.) Similarly, with regard to the assault on Daniel Solis, the witness to the two murders, counsel underscored the fact that when defendant shot at the victim, it was a "scattered shot" and that defendant had "no intention *to kill*." (Italics added.)

The state of the instructions, while perhaps potentially confusing, posed no reasonable likelihood of jury misunderstanding, nor did the arguments of counsel and the prosecutor exacerbate the instructional problem. One final factor convinces us the instructional error does not require reversal. After argument and instruction, the jury found defendant guilty of assault with the intent to commit murder for the assaults on Officers McCann and Derenia, but of the lesser included offense of assault with a deadly weapon for the assaults on Ana Hernandez and Daniel Solis. It thus appears the jury properly differentiated between the McCann and Derenia assaults, and the Hernandez and Solis assaults. Moreover, it is inconceivable that defendant

shot at the officers with only implied malice as that phrase was defined for the jury, that is, with the intent simply to commit a felony that was "inherently dangerous to human life, such as robbery." Indeed, there was no evidence defendant shot at the officers with any intent other than to kill them and thus avoid capture. We conclude there was no reasonable likelihood the jury misunderstood the ambiguous instructions.

### 5. Ineffective Assistance of Counsel

Defendant next raises several grounds on which he claims his trial attorney, Marvin Part, was constitutionally ineffective. As we noted in *Avena I, supra*, 12 Cal.4th 694, the applicable law is settled. " '[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688; . . . .) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra,* at pp. 691-692; . . .) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland, supra,* at p. 694.)' (*People* v. *Jennings* (1991) 53 Cal.3d 334, 357 [279 Cal.Rptr. 780, 807 P.2d 1009].)" (*Avena, supra,* 12 Cal.4th at p. 721.)[3]

Defendant raised several claims of ineffective counsel in the petition for a writ of habeas corpus denied in *Avena I*. Because defendant apparently is raising additional claims of ineffective counsel on direct appeal, it is appropriate to reiterate our admonition from *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]: "In some cases, . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, *these cases are affirmed on appeal.* [Citation.] Otherwise, appellate courts would become engaged 'in the perilous process of second-guessing.' [Citation.] Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's

---

[3]The issue of whether the *Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] standard was changed by *Lockhart* v. *Fretwell* (1993) 506 U.S. 364 [122 L.Ed.2d 180, 113 S.Ct. 838] need not be reached because defendant's claim is clearly meritless under any articulation of the appropriate standard. (See generally, *Avena I, supra,* 12 Cal.4th at pp. 721-722 & fn. 5.)

representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record. [¶] *Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus.*" (*People* v. *Pope, supra,* 23 Cal.3d at p. 426, fn. omitted, italics added; see also *People* v. *Cudjo* (1993) 6 Cal.4th 585, 623 [25 Cal.Rptr.2d 390, 863 P.2d 635] [following *Pope*].) With this in mind, we turn to defendant's claims.

### a. *Miranda*

■ Defendant first argues counsel should have moved to suppress his statements on the ground he was never read his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) We addressed this issue in defendant's habeas corpus proceeding. In our opinion in *Avena I,* we explained that because counsel moved midtrial (and *prior to* the confession's admission) to exclude defendant's statements on *Miranda* grounds, the ineffectiveness claim was meritless. (*Avena I, supra,* 12 Cal.4th at pp. 728-729.) Defendant does not direct our attention to anything in the appellate record that casts doubt on that conclusion.

Defendant contends his counsel conceded the *Miranda* issue by admitting to the trial court he had not previously heard defendant's claim that he was never read his rights. Defendant also complains this admission by counsel "denigrated" his demand for a hearing on the subject. We reject the contention; on learning of the claim, counsel immediately and successfully moved for an Evidence Code section 402 hearing to determine the admissibility of defendant's statements in an attempt to exclude them. We perceive no attorney incompetence in this regard.

### b. *Voluntariness of Confession*

■ In addition to the claim already raised and rejected on habeas corpus, defendant contends counsel should have moved to suppress his statements on the ground they were involuntary, "a product of physical coercion and improper threats regarding the death penalty." Although defendant does not enumerate the physical maltreatment to which he is referring, we assume he intends to rely on his testimony in the midtrial Evidence Code section 402 hearing held to evaluate his *Miranda* claim. In that hearing, defendant

testified he was slapped about the face, grabbed by the testicles, and had his head slammed against the wall during his interrogation.[4]

At the same hearing, Officer Warren Pickens testified and denied any physical abuse of defendant during the interrogation. Investigator Ronald Fesperman testified similarly. When making his motion to suppress, counsel noted there were "several reasons" why the court should decide to suppress defendant's statements, including failing to read the *Miranda* rights, failure to respect defendant's alleged request for an attorney, and "[o]f course, *there is the beating aspect*." (Italics added.) Although an inartful articulation of the claim that the statements were involuntary as the alleged product of a physical assault, counsel's reference to the "beating aspect" fairly raised the issue. The trial court, noting that the issue boiled down to a credibility contest and that it believed the police officers over defendant, concluded "that the statement was *freely and voluntarily* given. . . ." (italics added), thus impliedly finding the statements were not the result of physical abuse. Thus, we find that because Part in fact raised the issue of the alleged involuntariness of defendant's statements, there is no basis for defendant's present claim that his attorney was ineffective for failing to raise the issue.

We reach a similar conclusion with regard to the claim defendant's statements were the result of improper threats regarding the death penalty, a claim supported by two citations to legal authority but none to the record. (See *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1227-1228 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [this court not required to scrutinize the record for testimony on which defendant relies].) Of course, "[a] [c]onfession induced by the threats of prosecution for a capital crime [has] been held inadmissible." (*People* v. *Thompson, supra*, 50 Cal.3d 134, 169.) Our review of the transcript of the interrogation reveals nothing that could remotely be regarded as a threat to give defendant the death penalty if he did not confess. Accordingly, we conclude counsel was not ineffective for failing to move to suppress the statements on this ground.

### c. *Failure to Object*

Defendant alleges trial counsel was ineffective for failing to object to three instances of prosecutorial misconduct in closing argument. Defendant contends the prosecutor committed misconduct by misstating the facts (*People* v. *Purvis* (1963) 60 Cal.2d 323, 343 [33 Cal.Rptr. 104, 384 P.2d

---

[4]We referred to this evidence in *Avena I, supra*, when discussing the related claim on habeas corpus that counsel was ineffective for failing to file a *Pitchess* motion (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]) to discover whether Officer Pickens had previously engaged in brutality. (*Avena I, supra*, 12 Cal.4th at p. 730.)

424]) and expressing his personal opinion (*People* v. *Anderson* (1990) 52 Cal.3d 453, 473 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 236 [253 Cal.Rptr. 55, 763 P.2d 906]). ▆▆▆ We turn to those claims, keeping in mind that "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People* v. *Kelly* (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

▆▆▆ (i) During closing argument, the prosecutor stated, "Victor Padua, his statement, his testimony here were absolute truth. *And I know that.*" (Italics added.) Defendant correctly contends this statement was improper because it was an expression of personal opinion by the prosecutor. Because the evidence of defendant's participation in the crimes was quite strong and generally uncontradicted, however, counsel may reasonably have believed an objection to this brief comment was fruitless.

(ii) Continuing, the prosecutor remarked: "Defense counsel never once showed any inconsistencies because there weren't any inconsistencies. [¶] He never once showed you that Victor Padua did anything to make him look like he wasn't telling the truth or made any other statements that weren't just exactly what happened on the night of the 13th, and, in fact, you know from other witnesses that Victor Padua could not possibly have known about . . . their testimony, the People across the street, the police officers, *Victor obviously is not friends with those people and hasn't talked to them.*" (Italics added.) Although defendant's complaint here is not clear, we assume he intends to argue the italicized phrase implies the prosecutor was relying on evidence not presented to the jury regarding whether Victor Padua is acquainted with the witnesses to the Solis and Vasquez murders. Read in context, however, the prosecutor was merely noting that Victor Padua's story was probably true because it dovetailed perfectly with the testimony of other witnesses—police officers and eyewitnesses to the murders—whom "he can't know." This was a fair inference drawn from the evidence. Accordingly, there was no misconduct, and thus no reason to object.

(iii) The prosecutor told the jury that Officers McCann and Derenia, at whom defendant shot, "testified before you that they went to a line-up and that they picked immediately the defendant out of that line-up." Defendant contends this assertion was untrue. The record does not bear out defendant's contention. Accordingly, counsel cannot be faulted for failing to object.

In sum, we conclude counsel was not remiss in failing to object to the cited instances of alleged prosecutorial misconduct.

#### d. *Additional Claims*

■ Defendant contends counsel was ineffective for a variety of reasons, such as: (a) he failed to argue diminished capacity, lack of intent, or other "apparent[ly] viable defenses"; (b) he conceded defendant's guilt of the capital offenses before the jury; (c) he argued against defendant, thereby effecting an abandonment of his client; and (d) he exhibited a "total lack of interest, diligence, and advocacy." Because the evidence supporting a diminished capacity defense was weak (see discussion, *ante*, at pp. 414-415), we may assume counsel had a reasonable tactical purpose for declining to argue diminished capacity to the jury. In addition, defendant does not explain why another defense would have been successful. Defendant's claim that counsel was not interested in the case is simply too vague an assertion on which to ground a finding of constitutional error.

The claim that counsel conceded guilt is apparently based on the fact that, in closing argument, counsel addressed the evidentiary support for the four counts of assault with the intent to commit murder (former § 217), but did not argue defendant was innocent of the murders. This contention is related to the claim that counsel argued against his client. In support, defendant points to counsel's closing argument, where he stated: "The tape is right in front of you, literally confessing to shooting down a couple of people . . . cold-blooded[ly] on the streets in Los Angeles County." Counsel went on to explain that defendant should be believed when he claimed he did not intend to murder Ana Hernandez or Daniel Solis, as he had no hesitation in admitting to police his guilt in other, more serious, matters.

Although this line of argument is troubling, this is the type of case we described in *People* v. *Pope, supra*, 23 Cal.3d at page 426, that is, a case in which, "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged." Moreover, counsel was not asked for an explanation on the record. Accordingly, *Pope* counsels that we should affirm the judgment "unless there simply could be no satisfactory explanation." (*Ibid.*)

Normally, we could conclude that counsel could have been trying to preserve his credibility for the penalty phase, in light of the overwhelming and irrefutable evidence of guilt. (See *People* v. *Kelly, supra*, 1 Cal.4th at p. 522 ["[c]ounsel's credibility would suffer if he argued a fact at the guilt phase that was contrary to what the jury [would] later [hear] from his client's own mouth"]; *People* v. *Wright* (1990) 52 Cal.3d 367, 408 [276 Cal.Rptr.

731, 802 P.2d 221] [noting the tactical strategy of preserving counsel's credibility for the penalty phase in light of strong guilt phase evidence].) The record in this case, however, reveals counsel presented almost no evidence at the penalty phase of the trial.

Even assuming this is a case in which "there simply could be no satisfactory explanation" for counsel's apparent concession of defendant's guilt in closing argument (*People* v. *Pope, supra,* 23 Cal.3d at p. 426), that would satisfy only the first part of the test. We must still determine whether counsel's performance resulted in prejudice, that is, whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164].) We conclude no prejudice is apparent on the facts of this case. Evidence of defendant's guilt was overwhelming, and the evidence supporting a claim of a diminished mental state was slim, as detailed *ante,* at pages 414-415, and in *Avena I.* We are aware of no other defense to the murder charges, and defendant does not persuasively demonstrate that one existed. Accordingly, although we reiterate that "[w]e are admittedly less than sanguine about [counsel's] apparently minimal representation in this case" (*Avena I, supra,* 12 Cal.4th at p. 738), we find counsel was not constitutionally ineffective for failing to contest and, indeed, all but admitting, during closing argument, defendant's guilt of the two murders.

### 6. *Failure to Instruct on Jury Note Taking*

 Defendant contends the trial court erred by failing to instruct the jury sua sponte about the dangers inherent in note taking. Although defendant reasonably relies for this argument on dictum in *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-747 [205 Cal.Rptr. 810, 685 P.2d 1161], we made clear after he filed his opening brief that the trial court is not required to give such a cautionary instruction. (*People* v. *Marquez* (1992) 1 Cal.4th 553, 578 [3 Cal.Rptr.2d 710, 822 P.2d 418].)

### 7. *Failure to Instruct on Lesser Included Offenses*

 Defendant next argues the trial court committed prejudicial error by failing to grant his request that the jury be instructed on second degree murder and manslaughter. In support, defendant argues the evidence presented at trial could reasonably be interpreted to show that he did not kill in

the course of a robbery because there was insufficient evidence he intended permanently to deprive the victims of their car.[5]

We disagree. Of course, " '[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction.' " (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 696 [276 Cal.Rptr. 788, 802 P.2d 278], quoting *Hopper* v. *Evans* (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 373, 102 S.Ct. 2049], italics in original; see also *People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311], overruled on another point, *People* v. *Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531].) In this case, there was no substantial evidence from which the jury could reasonably have concluded defendant shot and killed the victims and took their car, but did not at that time intend to keep the car. (*People* v. *Neely* (1993) 6 Cal.4th 877, 897 [26 Cal.Rptr.2d 189, 864 P.2d 460] ["The record contains no substantial evidence that would have supported defendant's conviction of second degree murder or voluntary manslaughter."]; *People* v. *Morris* (1991) 53 Cal.3d 152, 211 [279 Cal.Rptr. 720, 807 P.2d 949] ["Defendant advances no theory consistent with the evidence that would have allowed the jury to convict him of second degree murder." (Fn. omitted.)]; see also *People* v. *DeLeon* (1982) 138 Cal.App.3d 602, 606 [188 Cal.Rptr. 63] [subsequent abandonment of stolen car does not compel conclusion robber's intent was to deprive the victim of his car only temporarily].) There was no evidence showing defendant intended to return the car to its owners, that he took the car in a good faith belief he owned it, that he acquired the intent to steal only after taking the car, or that he took the car inadvertently. We thus reject the claim the trial court erred in refusing to instruct the jury on lesser included offenses.

B. *Special Circumstance Issues*

1. *Failure to Instruct on Intent to Kill*

Defendant contends the trial court should have instructed the jury it could not find the felony-murder special-circumstance allegation true unless it first decided he acted with the intent to kill the victims. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) Because we have since overruled *Carlos* (*People* v. *Anderson, supra,* 43 Cal.3d 1104, 1147), that case does not require we strike the felony-murder special-circumstance allegation. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1053 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [*Anderson* applies to pre-*Carlos* cases].) Moreover,

---

[5]We note that the record suggests defense counsel sought these instructions on the ground defendant's mental capacity was diminished by voluntary intoxication, not because the evidence was insufficient to prove an intent to permanently deprive the victims of their car.

because defendant did not commit his crimes during the window period between *Carlos* and *Anderson,* he is not entitled to the benefit of the prior rule requiring a showing of intent to kill. (See *People* v. *Hawkins* (1995) 10 Cal.4th 920, 957-958 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

### 2. *Duplicative Multiple-murder Finding*

The information alleged two multiple-murder special circumstances, one in connection with each murder, and the jury found both true. Defendant contends only one special circumstance finding is proper under such circumstances. He is correct (*Hardy, supra,* 2 Cal.4th at p. 191); one of the findings should be stricken.

Defendant further argues the duplicative charging prejudiced him, requiring we reverse the entire judgment. We disagree; the charging of a superfluous special circumstance allegation could not have confused the jury about the number of murders defendant committed, because each allegation specified the name of the other victim. Moreover, the prosecutor made no attempt to use the duplicative findings against defendant. Indeed, in closing argument, the prosecutor spoke of the multiple-murder special circumstances in the singular rather than the plural. As in *People* v. *Hernandez* (1988) 47 Cal.3d 315, 357 [253 Cal.Rptr. 199, 763 P.2d 1289], we find "[i]t is inconceivable that finding true one more multiple-murder special circumstance than was strictly correct had any influence on the outcome of the deliberations . . . ."

### C. *Penalty Phase Issues*

Defendant next launches a multi-pronged attack on the admission of evidence of other crimes and criminal conduct at his penalty phase. As we explain, all these claims lack merit.

### 1. *Admission of Violent Juvenile Misconduct*

As part of the evidence in aggravation, the People introduced evidence that when defendant was 17 years old, he fired a shotgun at some youths standing on a street corner, wounding one. The evidence was admitted under the statutory aggravating factor described in section 190.3, factor (b), which states that "[i]n determining the penalty, the trier of fact shall take into account . . . [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence . . . ." Defendant contends this evidence was inadmissible under factor (b), because it occurred when he was a juvenile and was adjudicated in juvenile court.

At the outset, we note defendant failed to object at trial on this ground, and thus waived the issue for appeal. Even were we to reach the issue, however, it is meritless. After defendant filed his opening brief in this appeal, we decided that evidence of violent juvenile conduct that would have been a crime if committed by an adult is admissible under section 190.3, factor (b). (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 72 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].) Accordingly, we reject defendant's argument.

Defendant also contends the prosecution should not have been permitted to introduce evidence detailing *the circumstances* surrounding the juvenile matter. Instead, he contends, the People should have been limited to informing the jury of the least adjudicated elements of those crimes. In essence, he argues that, although section 190.3, factor (c), authorizes the consideration of evidence of a prior conviction, to require him to relitigate the facts of the crime when it is offered under section 190.3, factor (b) would impose an unfair burden.[6]

Because counsel failed to object on this ground, the matter is waived for appeal. Even assuming for argument we overlook counsel's failure to object, it is meritless because—as in *People* v. *Brown, supra,* 46 Cal.3d at page 445—we conclude the evidence was clearly admissible as violent criminal *activity* under section 190.3, factor (b), which permits evidence of "[t]!ɜ presence or absence of criminal *activity* by the defendant which involved the use or attempted use of force or violence . . . ." (Italics added.) Manifestly, factor (b) permits the introduction of evidence of violent criminal activity over and above merely informing the jury of the fact of a conviction (or, as in this case, a juvenile adjudication), because "the purpose of factor (b) is to show the defendant's propensity for violence." (*People* v. *Wright, supra,* 52 Cal.3d 367, 432.) We thus reject defendant's claim the People were limited to introducing the least adjudicated elements of the juvenile misconduct.

### 2. *Subsequent Criminal Activity*

 Defendant argues his 1981 murder of fellow inmate Ruben Alfaro and the November 1981 assault on Deputy De Leon were improperly admitted as aggravating evidence at the penalty phase because both incidents occurred after the capital crimes in this case. We addressed this issue in *People* v. *Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480] (hereafter *Balderas*), in which we compared section 190.3, factor (c), with section 190.3, factor (b). We concluded that, whereas the use of the word

---

[6]In support, he relies on an argument made by the defendant in *People* v. *Brown* (1988) 46 Cal.3d 432, 445 [250 Cal.Rptr. 604, 758 P.2d 1135].

"prior" in factor (c) ("The presence or absence of any *prior* felony conviction." [Italics added.]) indicated that, for admissibility, such convictions must be entered *before* commission of the capital crime, section 190.3, factor (b), "imposes *no* time limitation on the introduction of 'violent' crimes." (*Balderas, supra,* at p. 202.) *Balderas* was decided a few months before defendant's opening brief was filed and has been followed consistently since then. (See *People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 577-578 [244 Cal.Rptr. 121, 749 P.2d 776].)

Defendant concedes we addressed the general issue in *Balderas,* but argues our opinion did not consider the specific statutory interpretation argument he now raises, and thus should not control his case. His argument focuses on an interpretation of the second and third unnumbered paragraphs of section 190.3, which state: "However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction. [¶] However, in no event shall evidence of *prior* criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted. The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings." (Italics added.)

Defendant points to the use of the word "prior" in the third paragraph of section 190.3, and argues the word would have no meaning unless it limited the use of evidence of other violent criminal conduct to acts occurring *before* the commission of the capital crime. (*Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272] [construction rendering statutory language surplusage to be avoided].) Moreover, he argues that if the drafters of the statute had intended to permit evidence of crimes committed after the capital offense, they would have omitted the word "prior" from section 190.3. Finally, to the extent the statute is ambiguous, he argues the ambiguity must be resolved in his favor. (See *People* v. *Walker* (1976) 18 Cal.3d 232, 242 [133 Cal.Rptr. 520, 555 P.2d 306] [criminal defendant entitled to benefit of doubt when interpreting penal statutes].)

We decline defendant's invitation to overrule *Balderas.* Although he is correct we did not in that case consider this precise statutory interpretation argument, we addressed essentially the same claim in *People* v. *Hovey, supra,* 44 Cal.3d 543. In *Hovey,* we interpreted substantially similar statutory language in the unnumbered paragraphs of former section 190.3, under the

1977 death penalty law, language requiring that evidence of "prior criminal activity" of which a defendant was acquitted be excluded from the penalty phase. We explained: "Neither of these . . . paragraphs is applicable here, and we find no legislative intent to limit the penalty phase evidence to forceful or violent criminal activity which preceded the charged offense. In light of the penalty jury's role, it would be anomalous to exclude from its consideration highly relevant evidence regarding the defendant's violent character and background." (*Hovey, supra,* 44 Cal.3d at p. 578.) Later, we concluded: "Nor can we think of any sound policy reason for limiting the penalty phase evidence in the manner suggested by defendant." (*Ibid.*)

By parity of reasoning, we reach the same conclusion under the 1978 death penalty law and reject defendant's contention that evidence under section 190.3, factor (b), must involve criminal activity that precedes the capital offense. Accordingly, the court did not err in admitting evidence concerning the Alfaro murder and the De Leon assault.

### 3. *Admission of Unadjudicated Crimes*

Defendant next argues the admission of several unadjudicated crimes, including the Alfaro murder, the De Leon assault, the shotgun attack while a juvenile, and the arson of the pink Camaro,[7] violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as parallel provisions in our state Constitution. In essence, he argues it is unfair to have the same jury that found him guilty of murder pass on the truth of unadjudicated criminal activity. In support, he cites opinions from other states and the concurring and dissenting opinion of Chief Justice Bird in *People* v. *Frierson* (1985) 39 Cal.3d 803, 821-822 [218 Cal.Rptr. 73, 705 P.2d 396].

We have previously rejected this identical claim, and are not persuaded we should depart from our past rulings. (*People* v. *DeSantis, supra,* 2 Cal.4th 1198, 1251-1252; *People* v. *Morris, supra,* 53 Cal.3d at p. 217; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 106 [270 Cal.Rptr. 817, 793 P.2d 23]; see also *Tuilaepa* v. *California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630] [upholding section 190.3, factor (b), against a vagueness challenge].) Accordingly, we reject the claim.

Defendant also contends admission at the penalty phase of evidence of unadjudicated crimes violated his constitutional right to due process, as

---

[7]We note that evidence concerning the arson of the Camaro defendant stole from the murder victims in this case was admissible in any event under section 190.3, factor (a), which permits the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . . ."

well as his right to be free of compelled self-incrimination under the Fifth Amendment.[8] He argues that, because no trier of fact had decided his guilt of the Alfaro murder beyond a reasonable doubt when evidence of that offense was admitted, he was placed in the untenable position of either (i) testifying and denying the crime, whereupon he would lose the privilege against compelled self-incrimination for a future trial in the Alfaro matter, or (ii) remaining silent, thereby leaving the evidence of his guilt unrebutted. Thus, he claims that out of fear of incriminating himself in a future trial, he was coerced into giving up the opportunity of giving mitigating evidence (or at least denying aggravating evidence) at the penalty phase.

We addressed this precise issue in *People* v. *Caro, supra,* 46 Cal.3d 1035. There we concluded that "[t]he forced choice of which defendant complains is permissible under the federal Constitution." (*Id.* at p. 1056.) We further explained: " 'The criminal process . . . is replete with situations requiring the "making of difficult judgments" as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' " (*Ibid.,* quoting *McGautha* v. *California* (1971) 402 U.S. 183, 213 [28 L.Ed.2d 711, 729, 91 S.Ct. 1454].) Defendant fails to persuade us that *Caro* was incorrectly decided.

### 4. *Robertson Error*

 Defendant next contends the trial court erred prejudicially by failing to instruct the jury sua sponte that it could not consider the evidence he had committed crimes other than those with which he was charged, unless the jury first concluded those other crimes were proved beyond a reasonable doubt. Such an instruction is required by state law. (*Hardy, supra,* 2 Cal.4th at p. 204; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 965 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279] (plur. opn. by Kaus, J.); *id.* at p. 60 (conc. opn. of Broussard, J.).) The People concede the error, but argue it was harmless. We have previously held this type of state law error is subject to a harmless error analysis (*People* v. *Pinholster, supra,* at p. 965; *Hardy, supra,* at p. 205), specifically, whether it is "reasonably possible" the failure to instruct affected the verdict. (*People* v. *Brown, supra,* 46 Cal.3d at pp. 446-449; see *People* v. *Wright, supra,* 52 Cal.3d at p. 438 [applying the *Brown* "reasonable possibility" standard].)

Despite this past authority, defendant contends that failure to instruct a penalty phase jury other crimes must be proved beyond a reasonable doubt

---

[8]In support, he relies on an argument made by the defendant in *People* v. *Caro, supra,* 46 Cal.3d at pages 1055-1056.

(so-called *Robertson* error) is not subject to a harmless error analysis. In support, he cites a recent Eighth Circuit case (*Rust* v. *Hopkins* (8th Cir. 1993) 984 F.2d 1486, cert. den. *sub nom. Hopkins* v. *Rust* (1993) 508 U.S. 967 [124 L.Ed.2d 697, 113 S.Ct. 2950] (hereafter *Rust*)), which in turn relies on precedent from the United States Supreme Court (*Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227] (hereafter *Hicks*)), and distinguishes another high court opinion (*Clemons* v. *Mississippi* (1990) 494 U.S. 738 [108 L.Ed.2d 725, 110 S.Ct. 1441] (hereafter *Clemons*)). As we explain, *Rust* is inapplicable to this case.

### a. *Hicks, Clemons, and Rust*

Relying on *Rust, supra,* 984 F.2d 1486, defendant contends that because he has a right under state law to have the jury consider, as an aggravating circumstance, his participation in violent criminal activity *only* if such activity is proved beyond a reasonable doubt, state law creates a liberty interest in that procedure that is protected by the due process clause of the Fourteenth Amendment to the federal Constitution. As we explain, even assuming *Rust* was correctly decided, it does not control this case.

In *Rust,* the Eighth Circuit Court of Appeals confronted the Nebraska state capital sentencing scheme, whereby a panel of three state judges sits in judgment to determine the existence of one or more aggravating factors, which, under Nebraska law, render a defendant eligible for the death penalty (the "narrowing" function); this sentencing panel then weighs the aggravating and mitigating factors to determine whether death or life is the appropriate penalty (the "selection" function). (Neb. Rev. Stat. § 29-2522 (1973).) Under the Nebraska scheme, then, the "narrowing" and the "selection" functions of the capital sentencing scheme are combined into one proceeding, and both determinations are made by the same three-judge panel. (See *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 246 [98 L.Ed.2d 568, 582-583, 108 S.Ct. 546] [explaining the differing roles of narrowing and selection in capital sentencing schemes].)

At issue in *Rust, supra,* 984 F.2d 1486, was a death judgment rendered by such a three-judge panel. The panel found the presence of four statutory aggravating factors (thus rendering the defendant death-eligible) and one mitigating factor. After weighing these factors, the panel decided death was the appropriate penalty. (*Rust, supra,* at p. 1488.) On the same day that the Nebraska Supreme Court upheld Rust's death judgment in *State* v. *Rust* (1977) 197 Neb. 528 [250 N.W.2d 867], it decided another case, *State* v. *Simants* (1977) 197 Neb. 549 [250 N.W.2d 881] (cert. den. 434 U.S. 878 [54 L.Ed.2d 157, 98 S.Ct. 230]), and held for the first time that all aggravating

factors must be proved beyond a reasonable doubt. Although the state sentencing panel had not used that standard in Rust's case, the Nebraska high court nevertheless affirmed the death judgment, finding the evidence at Rust's trial was sufficient to prove the four aggravating factors by this higher standard. (*State* v. *Rust, supra*, 250 N.W.2d at p. 876.)

Affirming the federal district court's grant of habeas corpus relief on Rust's petition, the Eighth Circuit Court of Appeals held that "Nebraska [had] created a liberty interest in having a panel of judges make particular findings, specifically, the proper weight to be given aggravating circumstances based on facts proven beyond a reasonable doubt. Rust was deprived of this interest, a deprivation so serious that it cannot be cured by appellate review." (*Rust, supra*, 984 F.2d at p. 1493.) The circuit court described the situation as involving not merely the panel's improper consideration of an invalid aggravating circumstance or factor, but, rather, the appellate court's total replacement of invalid proceedings with later, "corrected" proceedings. This attempted correction failed, the court held, because no state law authorized the substitution of appellate review for the initial exercise of discretion by the three-judge panel, and because such substitution deprived the defendant of the opportunity of meaningful appellate review. (*Id.* at pp. 1494-1495.)

*Rust* is, of course, a lower federal court decision, and we are not bound to follow it. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [36 Cal.Rptr.2d 474, 885 P.2d 887] ["we are not bound by decisions of the lower federal courts, even on federal questions"]; *In re Tyrell J.* (1994) 8 Cal.4th 68, 79 [32 Cal.Rptr.2d 33, 876 P.2d 519] [lower federal courts persuasive but not controlling]; but see *People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129] [lower federal court decisions "persuasive and entitled to great weight"].) After considering the reasoning in that case, we conclude that even assuming for argument *Rust* is correct and we were to apply it here, it would not require reversal.

Under the Nebraska capital sentencing scheme at issue in *Rust,* the requisite "narrowing" function is served by a finding that one or more aggravating factors is true. In *Rust,* the application at the "narrowing" stage of an improper standard of proof necessarily undermined the threshold determination whether the defendant was eligible for the death penalty, by permitting the "true" finding to be made on less than adequate proof. Because the defendant was entitled to the three-judge panel's decision—and not just an appellate decision—on whether his case fell within the narrow range of cases for which the death penalty was permitted, the *Rust* court affirmed the district court's grant of the writ of habeas corpus.

In California, by contrast, the jury performs the "narrowing" function by determining, at the guilt phase of trial, the truth of the special circumstance allegations. (*People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 468 [24 Cal.Rptr.2d 808, 862 P.2d 808].) If the jury finds defendant is eligible for the death penalty (that is, if it finds at least one special circumstance allegation to be true), the jury moves on to the "selection" function, which it undertakes at the penalty phase. (See, generally, *id.*, at pp. 465-470.) The error in this case, *Robertson* error, occurred in the *penalty phase selection process*, when the trial court failed to instruct the jury sua sponte that it may not consider the evidence of other crimes presented in aggravation unless those crimes were proved beyond a reasonable doubt. This error was different in kind from the error in *Rust*, because the error infected only sentence selection, not the narrowing function. Error of this type is subject to harmless error analysis. (*Clemons*, *supra*, 494 U.S. at p. 741 [108 L.Ed.2d at pp. 733-734].)

Nor does *Hicks*, *supra*, 447 U.S. 343, require us to reverse the judgment for *Robertson* error. In *Hicks*, the United States Supreme Court held that, under certain circumstances, when a state provides that the punishment for a criminal act shall be in the discretion of the trial jury, the defendant may have "a substantial and legitimate expectation that he will be deprived of . . . liberty only to the extent determined by the jury in the exercise of its statutory discretion [citation] and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." (*Hicks*, *supra*, 447 U.S. at p. 346 [65 L.Ed.2d at p. 180].)

As we recently noted, however, since *Hicks* was decided, "[t]he high court has made plain that *Hicks* does not invalidate every true finding rendered on a sentencing provision when the jury has received flawed instructions." (*People* v. *Wims* (1995) 10 Cal.4th 293, 310 [41 Cal.Rptr.2d 241, 895 P.2d 77], citing *Clemons*, *supra*, 494 U.S. 738.) Thus, as noted above, this court may, consistent with the Constitution, apply a harmless error analysis when the jury has considered an invalid or improperly defined aggravating factor in its penalty phase deliberations. (See *People* v. *Wims*, *supra*, at p. 310.)

Accordingly, application of a harmless error test to *Robertson* error does not violate a due process liberty interest defendant might have in a beyond-a-reasonable-doubt jury instruction for "other crimes" aggravating evidence. We thus conclude that, based on the express statements in *Rust* and *Clemons*, as well as our explication in *People* v. *Wims*, *supra*, 10 Cal.4th 293, of the holdings in those cases, we can—consistent with constitutional guarantees—determine whether the instructional omission was harmless based on principles of state, not federal constitutional, law. We now turn to that question.

### b. *Was the Robertson Error Harmless?*

 Is it "reasonably possible" that the failure to instruct the jury with the *Robertson* instruction (that is, that other crimes must be proven beyond a reasonable doubt before they may be considered) affected the verdict? Of three instances of "other criminal activity" introduced in the penalty phase— shooting at youths on a street corner, assaulting Deputy De Leon, killing Alfaro—the least serious incident was the assault on De Leon. Respondent argues the *Robertson* error was harmless with respect to this evidence because the incident was trivial when compared to the charged offenses and the other crimes. We agree the error was harmless, but for a slightly different reason: the evidence presented at the penalty phase regarding the assault on De Leon was quite strong. Deputy De Leon testified, and his account was corroborated by Deputy Mushinki. Significantly, defendant did not offer any contrary evidence. Under the circumstances, "we perceive no reasonable possibility that reasonable jurors would have rendered a different verdict had the instruction error . . . not occurred" with respect to the assault on Deputy De Leon. (*People* v. *Brown, supra,* 46 Cal.3d at pp. 448-449.)

The shotgun assault was more serious, but the result is the same. The officer who arrested defendant for the juvenile offense testified at trial that after being advised of his constitutional rights, defendant admitted firing a shotgun at the victims. Defendant did not present any evidence at trial raising a reasonable doubt as to his guilt, nor does he now argue he was not involved in the shooting. Because the evidence was uncontroverted, the absence of the beyond-a-reasonable-doubt instruction was not prejudicial. (*People* v. *Pinholster, supra,* 1 Cal.4th at p. 965.)

The homicide of Alfaro was the most serious of the three incidents affected by the *Robertson* error. Respondent argues the error was harmless as to the Alfaro killing because defendant ultimately pleaded nolo contendere to second degree murder for this crime. Defendant protests that a condition of the plea in the Alfaro case was that the plea not be used in the instant capital case.[9] Defendant has the better of this argument, because the "Stipulation of Plea" states "this plea cannot be used for any other purpose whatsoever, or in connection with Case No. A362244 [i.e., the capital

---

[9]Respondent moves us to take judicial notice of the *judgment* in the Alfaro case. Defendant moves for judicial notice of the *conditions* of the plea, and to augment the appellate record to include a copy of documents from the Alfaro case that he claims will support his contention. We grant the motions to take judicial notice of both the judgment and the conditions of the plea in People v. Avena (Super. Ct. L.A. County, No. A-374816), as well as the transcript of the hearing at which the plea was accepted by Judge Dion Morrow, filed with the county clerk on January 24, 1984. (Evid. Code, § 452, subd. (d).) Defendant's alternative motion to augment the record on appeal is denied as moot.

case]." Respondent therefore cannot use the plea to establish the *Robertson* error was harmless.

The court that accepted defendant's plea cited a number of reasons why it considered the bargain a fair one. It pointed out that in the interval between the homicide and the filing of the complaint, the sheriff's department destroyed the records identifying the inmates in the cellblock at the time of the killing. This destruction of records deprived defendant of potential defense witnesses, and the court imposed a procedural sanction on the prosecution. Moreover, the trial court recognized that the victim "was not necessarily one of the more solid citizens of the community and that there may well have been some potential element of self-defense in this matter." The prosecutor conceded he was accepting the bargain "because of potential proof problems in the case." Given this situation, the state should not be permitted to acknowledge problems of proof as a reason for agreeing to a plea to the reduced charge, and then turn around and use the plea as evidence there were no such problems of proof.

Although we decline to use defendant's subsequent plea of nolo contendere to establish his guilt beyond a reasonable doubt of the Alfaro killing, we nevertheless find the *Robertson* error harmless as to that crime. The prosecution's evidence defendant murdered Alfaro was overwhelming. Both Deputy Oki and Deputy Minnis testified they personally observed defendant stabbing the prone victim in the chest. Other deputies testified to various aspects of the deadly attack, such as finding the shanks, apprehending coperpetrator Gonzalez, and discovering defendant's "body armor."

In opposition to this evidence, defendant failed to present evidence raising a reasonable doubt that he was the killer. He called two prison guards to the stand. Deputy Baylis testified he found a second shank, which belonged to Gonzalez, and then a third shank lying on the floor a few feet from Alfaro's body. The suggestion from this evidence was that the victim may have been armed with the third shank. Of course, this does not necessarily mean he was the aggressor; perhaps he was simply protecting himself from the attack of two armed inmates. Deputy Bauder testified that two days earlier, defendant had come to him with some minor wounds and complained of being attacked in the dayroom. Again, the suggested implication was that Alfaro held a grievance against him. Just as likely, however, is that after the altercation in the dayroom, Alfaro feared retaliation by defendant and armed himself as a result. We conclude that even taking this defense evidence into account, it is not reasonably possible a properly instructed jury would have entertained a

reasonable doubt defendant committed some degree of criminal homicide in killing Ruben Alfaro. We thus find the *Robertson* error was harmless.[10]

We also reject defendant's further related contention that the trial court should have instructed the jury sua sponte to disregard the other crimes evidence unless it unanimously found the crimes were true beyond a reasonable doubt. (*People* v. *Breaux* (1991) 1 Cal.4th 281, 322 [3 Cal.Rptr.2d 81, 821 P.2d 585] (hereafter *Breaux*); *People* v. *Jennings, supra,* 46 Cal.3d 963, 988.)

### 5. *Instructing on the Elements of Other Crimes.*

Defendant contends the trial court had a duty to instruct sua sponte on the elements of the other alleged crimes on which the People relied for aggravation. We have explained, however, that such an instruction is not required because "a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die." (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Payton* (1992) 3 Cal.4th 1050, 1068 [13 Cal.Rptr.2d 526, 839 P.2d 1035] [same].)

Defendant recognizes this rule, but argues it should not apply because his trial counsel could not have entertained the tactical considerations stated above, as the evidence of other crimes was the only aggravating evidence presented. Thus, he claims, counsel could not have feared placing undue focus on those crimes. The trial judge's duty, however, to instruct on the elements of other crimes in the absence of a request cannot turn on such subjective factors, for the judge cannot know what counsel is thinking. Thus, the rule is that an instruction on the elements of other crimes is not required sua sponte; defense counsel is of course permitted *to request* such an instruction. That counsel failed to do so here tends to undermine defendant's present argument that such instructions were "vital" to a proper consideration of the evidence. We thus reject this claim.

We also reject defendant's further arguments in support of his claim the trial court erred prejudicially by failing to inform the jury of the elements of

---

[10]Defendant claimed in his petition for a writ of habeas corpus that his attorney was constitutionally ineffective for failing to locate and present evidence of self-defense with regard to the Alfaro homicide, but we concluded there were no grounds for relief. (*Avena I, supra,* 12 Cal.4th at p. 737.)

the other crimes admitted in the penalty phase. Thus, the fact the prosecutor characterized the aggravating evidence favorably to his position (calling the juvenile assault an "attempt to kill," and the Alfaro homicide a "murder") does not convert the trial court's decision not to instruct sua sponte from a correct legal decision into an erroneous one. Further, that the jury took seven and one-half hours to deliberate the question of penalty also does not alter the analysis; we reject defendant's assumption the length of penalty deliberations in this case indicates the jury had "difficulty" with the penalty decision.

Finally, we reject defendant's evaluation of the alleged prejudice flowing from the *Robertson* error, because his characterization of the three instances of other violent crimes as the "only" aggravating evidence is inaccurate. Defendant fails to consider in this calculus the evidence of the crimes of which he was convicted, as well as the special circumstance allegations, which were both admissible under section 190.3, factor (a), and no doubt comprised powerful aggravating evidence.

### 6. *Weighing the Aggravating and Mitigating Factors*

Defendant claims the trial court made a number of errors in instructing the jury on weighing the aggravating and mitigating factors bearing on its penalty decision, and that these errors, individually and collectively, fatally undermine the reliability of the jury's decision to impose the death penalty. As we explain below, we reject these arguments.

### a. *Sympathy*

Defendant first points to the fact that after properly instructing the jury in the guilt phase not to be swayed by passion or sympathy, the court failed to instruct the jury sua sponte that the "no sympathy" instruction did not apply in the penalty phase. This omission, defendant argues, may have misled the jury into believing that sympathy could not legitimately influence their penalty determination. Defendant contends this error was magnified by the closing argument of both the prosecutor and defense counsel, in which both suggested the "no sympathy" instruction from the guilt phase still applied in the penalty phase.

We have previously rejected the argument that a trial judge is under a sua sponte duty at the penalty phase to countermand the "no sympathy" instruction delivered at the guilt phase. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 514 [250 Cal.Rptr. 550, 758 P.2d 1081] (hereafter *Keenan*); see also *People* v. *Williams* (1988) 44 Cal.3d 883, 955 [245 Cal.Rptr. 336, 751 P.2d

395] [court not obligated sua sponte to instruct jury to consider sympathy when selecting penalty].) Indeed, "[e]ven when given at the penalty phase, the California standard instruction on the irrelevance of 'mere sympathy' for the defendant (CALJIC No. 1.00) is not unconstitutional per se." (*Keenan, supra,* 46 Cal.3d at p. 514; see *California* v. *Brown* (1987) 479 U.S. 538, 542-543 [93 L.Ed.2d 934, 940-941, 107 S.Ct. 837] (plur. opn.); *id.* at p. 545 [93 L.Ed.2d at p. 942] (conc. opn. of O'Connor, J.).)

Moreover, we have also rejected the argument that giving the "no sympathy" instruction at the guilt phase has a prejudicial effect in the penalty phase (*People* v. *Sanders* (1990) 51 Cal.3d 471, 528 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Allison* (1989) 48 Cal.3d 879, 899, fn. 11 [258 Cal.Rptr. 208, 771 P.2d 1294]), and defendant fails to persuade that those cases should be reconsidered.

■ Defendant argues the prosecutor improperly suggested in closing argument that the jury could not consider sympathy as a mitigating factor. The prosecutor stated: "As you look at the defendant, ladies and gentlemen, and the judge, I believe, will also instruct you [that] you are not to vote by way of passion, prejudice, caprice, whim, fancy. . . . [¶] You've already been instructed as to that. . . . Ladies and gentlemen, I ask you [to] vote along with the facts *and in accordance with the evidence presented to you in this case.* [¶] . . . Vote in accordance with the law and do not look at the defendant, do not feel sorry for him." (Italics added.) A reasonable reading of this passage, however, reveals the prosecutor was merely arguing the jury should not base its decision—for or against the death penalty—on emotional factors untethered to any evidence presented in the case.

As defendant points out, his own counsel also touched on this subject in closing argument: "[N]obody in the world has any sympathy for a murderer. I don't have any sympathy for a murderer. And I don't think you should, too. I am not sitting here, I am not pointing at Mr. Avena and saying have sympathy for him. I don't want you to discuss this matter on sympathy because I think when you talk about sympathy and sorrow, you know you shouldn't think about the defendant." Fairly read, counsel was merely stating that defendant did not *deserve* sympathy, not that it would be *legally irrelevant.* Counsel developed this theme later in his argument, explaining that although defendant did not deserve sympathy, neither did he deserve the death penalty, for his crimes were not sufficiently heinous. This was not an unreasonable argument, especially given the dearth of any evidence painting defendant as a sympathetic figure. In sum, we find no error.

b. *Age*

■ Defendant next argues that the penalty phase jury instructions improperly permitted the jury to consider his age as an aggravating factor.

Moreover, he contends the prosecutor's closing argument encouraged this misunderstanding to his prejudice. As defendant himself recognizes in a supplemental brief, however, the law concerning this issue developed after he filed his opening brief. As we explained in *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]: "[T]he word 'age' in [section 190.3,] factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (See also *People* v. *Noguera* (1992) 4 Cal.4th 599, 649 [15 Cal.Rptr.2d 400, 842 P.2d 1160] [quoting *Lucky* with approval]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 232 [260 Cal.Rptr. 583, 776 P.2d 285] [same].) Accordingly, there was no instructional error.

### c. *Factors (a) and (b) Overlap*

 Defendant contends the trial court erred by failing to instruct the jury sua sponte and clarify that the "criminal activity" to which section 190.3, factor (b) refers is limited to crimes other than those for which the defendant was convicted in the guilt phase. Otherwise, he claims, the jury might be misled into double-counting those crimes as aggravating factors. We have rejected this precise issue (*Hardy*, *supra*, 2 Cal.4th at p. 205; *Breaux*, *supra*, 1 Cal.4th at p. 322; *People* v. *Bonin* (1988) 46 Cal.3d 659, 703-704 [250 Cal.Rptr. 687, 758 P.2d 1217]), and defendant does not persuade us our previous decisions were erroneous. Accordingly, we find no instructional error.

### d. *Character, Background, History, Mental Condition and Physical Condition*

 In addition to instructing the jury on the aggravating and mitigating factors expressly set forth in section 190.3, the trial court also instructed the jury to consider: "The defendant's character, background, history, mental condition and physical condition." This language was no doubt taken from the first paragraph of section 190.3, which states in pertinent part that; "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, . . . the defendant's character, background, history, mental condition and physical condition."

Defendant now argues this instruction is contrary to our holding in *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] (hereafter *Boyd*), because it permitted the prosecution to argue his bad character was a

factor in aggravation. In *Boyd*, we examined the 1978 death penalty law and concluded that not only must the jury "decide the question of penalty on the basis of the specific factors listed in the statute," but the evidence admitted at the penalty phase must be "relevant to those factors." (*Boyd, supra*, at pp. 773-774.) ▮ Although evidence in mitigation is not limited to statutory factors (*id.* at p. 775; see *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-900, 98 S.Ct. 2954]), "[e]vidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and [would] therefore [be] irrelevant to aggravation." (*Boyd, supra*, 38 Cal.3d at p. 774.) Thus, "[aggravating] evidence irrelevant to a listed factor is inadmissible" (*id.* at p. 775), unless it is to rebut defense mitigating evidence admitted pursuant to section 190.3, factor (k). (*Boyd, supra*, at p. 776.)

▮ Thus, after *Boyd,* the People may not present aggravating evidence showing the defendant's bad character unless the evidence is admissible under one of the listed factors or as rebuttal. Accordingly, the instruction defendant now challenges was erroneous, because it did not limit the jury's consideration of defendant's "character, background, history, mental condition and physical condition" to mitigation. We conclude, however, that the error was harmless because it is not reasonably possible that defendant would have enjoyed a different result had the error not occurred. The prosecution's penalty phase case was comprised of evidence of three incidents, each of which described violent criminal activity that was admissible under section 190.3, factor (b). The People did not attempt to introduce evidence that was inadmissible under an enumerated factor, but was nevertheless evidence of "the defendant's character, background, history, mental condition and physical condition." The fact that evidence of defendant's previous violent crimes was also indicative of his character or mental condition does not render the evidence inadmissible. Accordingly, there was no *Boyd* error.

Defendant also argues that although there was no *evidence* admitted under this rubric, he was unfairly prejudiced when the prosecutor made *comments* in closing argument suggesting the aggravating evidence that was admitted demonstrated defendant's bad character, and that he therefore deserved the ultimate penalty. Although the gist of the prosecutor's argument was that there was no evidence of defendant's *good* character, we need not parse the closing arguments this fine, for *Boyd* concerns the *admission* of aggravating and mitigating *evidence*, not the scope of permissible argument. The prosecutor was permitted to argue in closing argument any reasonable inference, from the evidence admitted, that was relevant to any of the statutory factors

in aggravation. (See *People* v. *Lucas* (1995) 12 Cal.4th 415, 496 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Moreover, to the extent defendant is claiming the prosecutor cannot comment in closing argument on a defendant's bad character or mental condition, even if such comments are drawn from properly admitted evidence, we note defendant failed to object to the argument on this ground. Accordingly, he waived that issue for appeal.

### e. *Sophistication or Professionalism*

■ Defendant makes the related argument that the trial court erred prejudicially by instructing the jury at the penalty phase to consider "[w]hether or not the manner in which the crime was carried out demonstrated criminal sophistication or professionalism on the part of the defendant." He correctly claims this consideration is not a statutory factor, and thus the trial court should have instructed the jury it could be considered for mitigation only. (*Boyd*, *supra*, 38 Cal.3d at pp. 772-776.)

Although it was error to so instruct the jury, we find no prejudice. The prosecution did not attempt to introduce any evidence that was admissible solely on the ground of criminal sophistication or professionalism, and, indeed, the People did not even make a direct argument that defendant's criminal sophistication or professionalism supported imposition of the death penalty. Although the prosecutor argued defendant was a "killing machine," likened him to a tiger and then to a cancer that must be removed, this falls short of an argument that defendant was criminally sophisticated or acted with professionalism. Thus, defendant's argument does not persuade even on its own terms.

### f. *Alleged Brown Error*

■ The court delivered the standard pre-*Brown* mandatory weighing instruction, which quoted the language of the statute. (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (hereafter *Brown*) revd. on another issue, *California* v. *Brown*, *supra*, 479 U.S. 538; CALJIC No. 8.84.1 (4th ed. 1979); § 190.3.) Defendant maintains this instruction prejudiced him by misleading the jury about the scope of its sentencing discretion, but on this record we find the argument untenable. We acknowledged in *Brown*, *supra*, 40 Cal.3d at page 544, footnote 17, that the instruction might in some cases confuse the jury about its role; specifically, the use of the word "shall" in the standard instructions raised concerns the jury might feel legally obligated to impose the death penalty, rather than appreciating it was to undertake a normative decision to determine whether the

death penalty was appropriate. Thus, the jury might improperly view the weighing process as prohibiting an individual juror from assigning "whatever moral or sympathetic value he deems appropriate" to the mitigating evidence. (*Brown, supra,* at pp. 538-541.) We said we would examine the record in each case to determine whether prejudicial confusion existed.

In addition, in *Brown* we were concerned that the jury would misinterpret section 190.3, factor (k). Factor (k) directs the jury's attention to "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The potential factor (k) misunderstanding harms a defendant only when he has introduced mitigating evidence unrelated to the crime, evidence that an unexpanded, pre-*Easley* factor (k) instruction might lead a reasonable juror to disregard. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Defendant, however, did not introduce any such evidence.

Defendant fails to establish that either of these problems arose below. First, defendant does not convince us the jury might have understood the weighing process in an unduly mechanical fashion. It is true that passages in the prosecutor's closing arguments, taken in isolation, could be understood as informing the jury the evidence had left it with no choice but to impose the death penalty. These passages, however, are balanced by passages suggesting the opposite, and in context appear as fair comment on the fact defendant failed to offer any evidence in mitigation. For example, the prosecutor told the jury: "You must, if you return a verdict that's just and that's a reflection of the law of this State, . . . you must return a verdict of death in this matter . . . ."

But the prosecutor immediately explained that this conclusion was based on his assessment of the evidence in the case, and particularly on the absence of any mitigating evidence. Thus, he immediately continued: "[B]ecause if you weigh the evidence, if you weigh the aggravating circumstances against that which are supposed to be present as mitigating circumstances, there is only one verdict you can come to, and that is that the defendant shall suffer the death penalty." The prosecutor closed with this comment: "If you follow the law, ladies and gentlemen, . . . if you *weigh* the evidence, mitigation as opposed to aggravation, you will decide, I am confident, that the only *appropriate* penalty in this matter is death. [¶] And ladies and gentlemen, that is the only *appropriate* penalty." (Italics added.)

Second, this is not a case in which defendant presented mitigating evidence unrelated to the crimes and the prosecutor relied on an erroneous reading of section 190.3, factor (k), to label that evidence irrelevant. Rather,

the prosecutor here merely drew the jury's attention to the fact defendant introduced no mitigating evidence at all. Moreover, the prosecutor did not encourage the jury merely to count the factors on each side of an imaginary scale. Instead, as stated above, the prosecutor repeatedly reminded the jury its role was to determine which of the two penalties was the "appropriate" one in this case. In sum, we find no reasonable possibility the jury was misled about its sentencing responsibility and discretion, and hence find no *Brown* error.

### g. *Reasonable Doubt*

Defendant contends the trial court erred prejudicially by failing to instruct the jury that before it could impose the death penalty, it must find that: (i) the aggravating factors outweigh the mitigating ones beyond a reasonable doubt, and (ii) death is the appropriate penalty beyond a reasonable doubt. We reject the claim. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131].)

### 7. *Alleged Prosecutorial Misconduct*

 Defendant argues the prosecutor committed three acts of misconduct in closing argument at the penalty phase. As we explain, we reject the claims.

### a. *Stating Facts Not in Evidence*

The prosecutor suggested to the jury in argument that victim Manuel Solis cooperated with defendant by handing over his car keys, but that defendant shot him anyway. The prosecutor stated: "[T]here is absolutely no moral justification for executing an innocent victim during the course of a robbery that he cooperates in. He hands you his keys and he's shot to death." Defendant asserts no witness actually testified Solis cooperated in that way; indeed, the police officer's testimony recounting defendant's statements indicated that defendant claimed Solis did not cooperate and instead displayed a knife. Defendant contends this misstatement constituted prejudicial misconduct.

We need not reach the merits of this claim, because defendant failed to make a timely objection and request an admonition when such an objection and admonishment would have cured the harm. Accordingly, any claim of prosecutorial misconduct was waived. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1248 [283 Cal.Rptr. 144, 812 P.2d 163].)

Defendant contends that if the issue was waived, then his trial counsel was constitutionally ineffective for failing to timely object. However, as we

stated before, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People* v. *Kelly, supra,* 1 Cal.4th at p. 540.) Questions of waiver and ineffectiveness aside, we find no misconduct on this ground: that the victim did not actively resist was a reasonable inference drawn from the evidence. Witnesses testified that Solis stood up and did "nothing" in response to defendant's robbery. Others testified to witnessing sudden and unprovoked gunfire. The jury was certainly not bound to accept defendant's version of the events at face value. Accordingly, we find no misconduct.

b. *Defendant's Bad Character*

In his closing arguments, the prosecutor referred repeatedly to defendant as a "killing machine" and a person who "has no conscience." He argued: "You have heard absolutely nothing in this trial, absolutely nothing to show that the defendant is of good character, has any moral fiber whatsoever, has any conscience whatsoever." Later, he concluded: "In this case there are no mitigating circumstances at all. None." Defendant argues these passages constitute references to his bad character, references he claims are impermissible under *Boyd, supra,* 38 Cal.3d 762. He also contends these statements constituted improper comment on his failure to testify. (*Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229] (hereafter *Griffin*).)

As above, we conclude defendant waived the issue by failing to object and request an admonition, when the harm could have been cured by such action. We also conclude the record does not demonstrate counsel was ineffective for failing to object. As we explained, *ante, Boyd* prohibits the admission into evidence of aggravating evidence that is not relevant to a statutorily enumerated category. *Boyd* does not prohibit the prosecutor from commenting in closing argument on reasonable inferences drawn from the properly admitted evidence.

We similarly find no *Griffin* error. *Griffin* forbids argument that focuses the jury's attention directly on an accused's failure to testify and urges the jury to view that failure as evidence of guilt. (*Griffin, supra,* 380 U.S. at pp. 609-615 [14 L.Ed.2d at pp. 107-110].) Here there was no direct or even implied comment on defendant's failure to testify. Instead, the prosecutor was merely pointing out defendant did not present any mitigating evidence, and so the balance of aggravating and mitigating factors clearly favored imposition of the death penalty. Consequently, there was no *Griffin* error and counsel was not ineffective for failing to object on this ground.

### c. *Prediction of Future Dangerousness*

Defendant contends the prosecutor committed misconduct by emphasizing that the evidence of the Alfaro killing demonstrated defendant cannot be incarcerated without posing a deadly threat to the lives of the other inmates. Defendant claims this line of argument constituted impermissible comment on his probable future dangerousness. In addition to having waived the issue by failing to object, the claim is also meritless. (*People* v. *Payton, supra,* 3 Cal.4th at pp. 1063-1064 [expert evidence of future dangerousness is inadmissible, but mere prosecutorial argument is permissible].)

### 8. *Alleged Ineffectiveness of Counsel*

Defendant argues several omissions by his trial attorney rendered his legal representation constitutionally ineffective, requiring reversal of the judgment. We have previously surveyed the applicable law, *ante,* at pages 418-419. ▪ To that discussion, we add that " '[i]n evaluating defendant's showing [a court accords] great deference to the tactical decisions of trial counsel in order to avoid "second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel 'to defend himself or herself against a claim of ineffective assistance after trial rather than to defend his or her client against criminal charges at trial. . . .' " ' [Citations.] ' "However, 'deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. "[D]eference is not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " ' [Citations.] Finally, we note that a criminal defendant can 'reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation.' " (*Avena I, supra,* 12 Cal.4th at p. 722, fns. omitted, citing and quoting *In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862]; *In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].)

### a. *Failure to Object to Evidence*

▪ Defendant contends his trial counsel, Marvin Part, was ineffective for failing to object to the admission of evidence of other crimes. Recalling our admonition that "[a]n attorney may choose not to object for many

reasons, and the failure to object rarely establishes ineffectiveness of counsel" (*People* v. *Kelly, supra,* 1 Cal.4th at p. 540), we address his claims seriatim.

Defendant first argues Part should have objected to the evidence of other crimes, citing *State* v. *McCormick* (1979) 272 Ind. 272 [397 N.E.2d 276]. In that capital case, the Supreme Court of Indiana held that admission of evidence of an unrelated murder denied the defendant due process, because the evidence of the unrelated murder, admitted as an aggravating circumstance, would be evaluated by a jury tainted by its earlier decision the defendant was guilty of the charged murder. (397 N.E.2d at p. 281.) This is not the law in California. (See, *ante,* at p. 428; see also *Balderas, supra,* 41 Cal.3d at p. 204; cf. *People* v. *Tahl* (1967) 65 Cal.2d 719, 738 [56 Cal.Rptr. 318, 423 P.2d 246].) Defendant does not argue the law was otherwise at the time of his trial; even assuming arguendo it was, the law is clear now, and it is not ineffectiveness of counsel to have failed to make an objection that was valid at the time, if the law has subsequently changed, and the resulting trial was not rendered unreliable or fundamentally unfair. (*Lockhart* v. *Fretwell, supra,* 506 U.S. 364, 372 [ L.Ed.2d 137, 190-191].) We thus reject this first claim.

Defendant next argues Part should have objected to the prior juvenile misconduct on the ground it did not constitute a criminal "conviction." As we explained, *ante,* at pages 425-426, we have held such an objection would have been meritless. Again, even assuming for argument such an objection would have been valid at the time of the 1980 trial, failure to make an objection that was valid at the time is not ineffectiveness of counsel if the law has subsequently changed, and the trial was not rendered unreliable or fundamentally unfair. (*Lockhart* v. *Fretwell, supra,* 506 U.S. at p. 372 [122 L.Ed.2d at pp. 190-191].) Finding *Fretwell*'s condition not satisfied, we reject this second claim.

To the extent defendant is arguing Part should have objected to evidence of the Alfaro homicide on the ground it occurred after the present crimes, we reject that argument on the same basis.

b. *Failure to Request Jury Instructions*

Defendant next contends Part was constitutionally ineffective for failing to request instructions that would have required the jury to find he was guilty of the other crimes beyond a reasonable doubt (i.e., the *Robertson* instruction). Even assuming for argument that counsel should have requested such an instruction, we have already concluded the absence of the instruction was

harmless. (See *ante*, at pp. 435-436.) Accordingly, counsel's failure to request the instruction cannot form the basis of any attorney incompetence requiring reversal.

Defendant also argues counsel should have requested a "pro-sympathy" instruction. Even assuming for argument that counsel should have requested such an instruction, defendant points to no evidence from which the jury could have concluded defendant was entitled to sympathy. Because it is defendant's burden to demonstrate not only that counsel's acts and omissions were unreasonable, but also that they resulted in prejudice, we conclude counsel's failure to request a "pro-sympathy" instruction, even if unreasonable, did not prejudice defendant and therefore does not require reversal.

To the extent defendant is arguing Part provided constitutionally ineffective legal representation by failing to object to prosecutorial misconduct, we have already discussed and rejected that claim.

### c. *Arguing Against His Client*

Defendant also argues Part was ineffective because he argued against his client in the penalty phase, imploring the jury not to feel sympathy for defendant, and stating that he did not deserve "a break" from the jury. This constituted, in defendant's opinion, a breakdown in the adversarial process and constitutionally ineffective assistance of counsel. We disagree.

Defense counsel was faced with a client whom the jury had just convicted of a double murder and multiple other assaults, and as to whom the jury had heard evidence that he fired a shotgun at a crowd when he was 17 and killed Ruben Alfaro while in pretrial detention in this case. Thus, Part obviously faced an uphill battle to convince the jury to eschew the death penalty. Nevertheless, it is clear counsel had a plan, for he argued that even though the jury found defendant guilty, he still did not deserve the death penalty because it was (or should be) reserved for the most heinous of this state's killers, mentioning several notorious killers of recent history. Part continued and compared defendant to those other killers, attempting to convince the jury the death penalty would not fit defendant's crime.

Of course, his strategy did not succeed, but that is not the test of competent counsel. In this case, it is difficult to see what Part should have done. As our opinion in the related habeas corpus proceeding makes clear, even had Part conducted a reasonable penalty-phase investigation, he would

have uncovered only a "meager" case in mitigation. (*Avena I, supra,* 12 Cal.4th at p. 735.) Under the circumstances, we conclude Part's strategy in closing argument did not violate defendant's rights under the Sixth Amendment or its analog under the state Constitution (Cal. Const., art. I, § 15).

### 9. *Proportionality Review*

Defendant next contends we should institute intercase proportionality review as a matter of state constitutional law, citing equal protection, due process, and cruel and unusual punishment concerns. We have rejected this argument. (*People* v. *Crittenden, supra,* 9 Cal.4th at pp. 156-157 (hereafter *Crittenden*); see also *Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40, 104 S.Ct. 871] [federal Constitution does not require intercase proportionality review].)

Defendant also asks that we undertake intracase proportionality review, arguing that the other two main principals, Arturo Padua (34 years to life) and Victor Padua (immunity, dismissal of all charges following 14 months in jail), received much less punishment when compared to him. "We previously have concluded that the imposition of a death sentence is subject to such review, because a sentence grossly disproportionate to the offenses for which it is imposed may violate the prohibition against cruel or unusual punishment." (*Crittenden, supra,* 9 Cal.4th at p. 157.)

It is obvious, however, that defendant's culpability in the crimes in question was much greater than that of either of the Paduas. Defendant was the only one of the three perpetrators with a firearm; he personally killed the victims; and the evidence presented at the penalty phase (the shotgun assault, the assault on deputy De Leon and, especially, the Alfaro homicide) was particularly aggravating. We find the death penalty is not grossly disproportionate to the crimes here.

### 10. *Motion to Modify Penalty*

Finally, defendant cites error in the court's consideration of his motion for modification of the verdict pursuant to section 190.4, subdivision (e). Specifically, he argues the court considered evidence not properly before it. The argument is meritless. Defendant maintains the court should not have considered the evidence pertaining to various instances of unadjudicated criminal activity, i.e., the uncharged shooting at a passing car, burning the stolen car, the assault on Deputy De Leon, the Alfaro homicide. Defendant's fundamental objection to these matters is that the jury should not have considered them in the first place. We have addressed his various arguments to that effect above, and his repetition of them here adds nothing new.

The court pointed out that defendant had a history of gang activity as a juvenile and hit his father with a chair. Defendant complains this information came from the probation officer's report, was not presented to the jury, and hence should not have been considered by the trial court when ruling on the section 190.4, subdivision (e), motion. Regarding the evidence defendant was engaged in gang activity, defendant is incorrect, because that was a logical inference from the evidence admitted in connection with the shotgun assault that occurred when defendant was 17 years old.

With regard to the evidence defendant hit his father with a chair, however, defendant is correct the trial court should not have considered that evidence. (*Crittenden*, *supra*, 9 Cal.4th at p. 151.) Nevertheless, we find no prejudice. This evidence was trivial when compared to the balance of the aggravating evidence, and "[t]here is no reasonable possibility that the court's apparent error in considering the probation report affected its decision." (*Id.* at p. 152.)

CONCLUSION

For the foregoing reasons, we vacate one multiple-murder special-circumstance finding, but otherwise affirm the guilt and penalty judgments of defendant Carlos Jaime Avena in their entirety.

George, C. J., Baxter, J., Chin, J., and Lucas, J.,* concurred.

**KENNARD, J.,** Concurring.—I concur in the judgment affirming the judgment of death. I agree with the majority that no issue raised in defendant's automatic appeal warrants reversal.

But in the related petition for writ of habeas corpus, which was recently before the court in *In re Avena* (1996) 12 Cal.4th 694 [49 Cal.Rptr.2d 413, 909 P.2d 1017], I expressed the view, which I still hold, that defendant's convictions and death sentence should have been set aside for ineffective assistance of counsel (*id.* at pp. 782-783 (dis. opn. of Kennard, J.)). The court's decision in that case is now final, and is therefore binding under the doctrine of stare decisis.

**MOSK, J.**—I dissent.

I would dismiss the appeal as moot. That is because I would have vacated the underlying judgment on habeas corpus for ineffective assistance of

---

*Retired Chief Justice of the Supreme Court, assigned by the Acting Chief Justice pursuant to article VI, section 6, of the California Constitution.

counsel in violation of the Sixth Amendment to the United States Constitu-
tion. (*In re Avena* (1996) 12 Cal.4th 694, 741-782 [49 Cal.Rptr.2d 413, 909
P.2d 1017] (dis. opn. of Mosk, J.).) There, on initial consideration, I found
the "assistance"—better, the "*non*assistance"—that trial counsel furnished
defendant to be "*shockingly* ineffective." (*Id.* at p. 741 (dis. opn. of Mosk,
J.), italics added.) Here, after revisiting the question, I have regrettably been
confirmed in my assessment.

If I were not of the view that the appeal should be dismissed, I would be
inclined to set aside defendant's sentence of death for "*Robertson* error"
(*People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279]),
that is, the superior court's failure to instruct the jury that the prosecution
bore the burden of proving other crimes at the penalty phase beyond a
reasonable doubt. Asserting that the offenses in question were supported by
"overwhelming evidence," the majority hold the error harmless. Their ap-
proach, however, is inconsistent with that taken by the United States Su-
preme Court in *Sullivan* v. *Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182,
113 S.Ct. 2078]. Dealing with a trial court's analogous failure to instruct the
jury that the prosecution bore the burden of proving charged crimes beyond
a reasonable doubt, *Sullivan* makes plain that a reviewing court's invocation
of "overwhelming evidence" is not enough.

In any event, I would surely set aside defendant's sentence of death as
unreliable under the Eighth Amendment to the United States Constitution
and article I, section 17 of California Constitution because trial counsel
introduced none of the available mitigating evidence. (See *People* v. *Lucas*
(1995) 12 Cal.4th 415, 501-502 [48 Cal.Rptr.2d 525, 907 P.2d 373] (conc.
and dis. opn. of Mosk, J.) [implying that any sentence of death should be
vacated as unreliable under the Eighth Amendment and article I, section 17
if trial counsel introduced none of the available mitigating evidence]; *In re
Ross* (1995) 10 Cal.4th 184, 216, fn. 1 [40 Cal.Rptr.2d 544, 892 P.2d 1287]
(dis. opn. of Mosk, J.) [same]; *People* v. *Stansbury* (1995) 9 Cal.4th 824, 835
[38 Cal.Rptr.2d 394, 889 P.2d 588] (conc. and dis. opn. of Mosk, J.) [same],
reiterating *People* v. *Stansbury* (1993) 4 Cal.4th 1017, 1074 [17 Cal.Rptr.2d
174, 846 P.2d 756] (conc. and dis. opn. of Mosk, J.), revd. *sub nom.*
*Stansbury* v. *California* (1994) 511 U.S. 318 [128 L.Ed.2d 293, 114 S.Ct.
1526]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834
P.2d 1171] (conc. and dis. opn. of Mosk, J.) [same]; see also *People* v.
*Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315]
(conc. and dis. opn. of Mosk, J.) [finding a sentence of death unreliable
under the Eighth Amendment and article I, section 17 when trial counsel
introduced none of the available mitigating evidence, albeit at the defend-
ant's request]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 531-533 [273

Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.) [same]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. and dis. opn. of Mosk, J.) [same]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. and dis. opn. of Mosk, J.) [to similar effect under the Eighth Amendment]; *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925] [same].)

Appellant's petition for a rehearing was denied July 18, 1996, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.