Filed 8/27/13  P. v. Bernabe CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANDRES BERNABE, <br><br> Defendant and Appellant. | B241493 <br><br> (Los Angeles County <br> Super. Ct. No. GA 084076) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell Mavis, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Andres Bernabe challenges his conviction for one count of assault with intent to commit rape or oral copulation.  He claims his counsel was ineffective for failing to request an instruction that the jury could consider voluntary intoxication in deciding whether appellant acted with the required specific intent.  We affirm.

## PROCEDURAL HISTORY

Appellant was charged with a single count of assault with intent to commit rape or oral copulation (Pen. Code, § 220, subd. (a)(1))[1] and following trial, a jury found him guilty.  The trial court denied probation, sentenced him to a low term of two years in state prison, and imposed various fines, fees, and custody credits not at issue here.  Appellant timely appealed.

## STATEMENT OF FACTS

At approximately 5:00 a.m. on Sunday, July 17, 2011, Dawn G., a homeless woman, was sleeping on a bench by the Metro Gold Line Station at Lake Avenue and Maple Street in Pasadena.  She woke up and was smoking a cigarette when a man, later identified as appellant, drove by slowly in a van.  Appellant rolled down the window and yelled out asking Dawn if she wanted to make some money, and she shook her head no.

Appellant drove past Dawn, made a U-turn at the next traffic light, and returned.  Dawn pressed "9-1-1" on her cell phone but did not press talk to send the call.  Appellant pulled up directly in front of her and again asked if she wanted to make some money, to which she responded, "No, I don't do that."  Appellant slammed the van's gear shift into park, got out of the van, and sat down on the bench next to her.  Dawn did not smell any odor of alcohol on him or hear him slurring his speech.

Appellant tried to put his hands down her shirt, and she pushed him away, telling him "get away from me, leave me alone."  When she lay down on her luggage, appellant stood up about three to four inches from her face, unzipped his pants, and took out his penis.  She sat back up and told him, "Get the f' away from me."  Appellant went around the side of the bench and grabbed her by the hair.  As he did so, Dawn pressed "talk" on her cell phone,

---

[1]     Undesignated statutory citations are to the Penal Code.

sending the previously dialed 911 call. Appellant then said, "You either get in my van or I'm going to fuck you right here." As Dawn kept screaming for appellant to get away from her and leave her alone, appellant was pulling her pants down, telling her to "suck his dick" and "fuck [him] right here." Because it was cold at night, Dawn wore jeans with thermals underneath, and appellant pulled them and her underwear down to her mid thigh, below her buttocks. Dawn saw a marked police car at a gas station across the street, so she began screaming for help. Appellant looked over his shoulder, and saw the police officers, so he got into his van, and left. At the time, Dawn was on the line with the 911 operator and was able to read the van's license plate number into the phone.

Dawn's recorded 911 call was played for the jury.[2] A California Highway Patrol (CHP) operator first took the call. On the call, appellant could be heard repeatedly asking and telling Dawn to "suck my dick" while Dawn repeatedly told appellant to get off her and stop. Dawn then told the dispatcher appellant "just jumped out of his car and he started putting his dick [unintelligible] and trying to put it, and then he tried to go down my pants, and he tried to –" The operated asked her if he tried to rape her, and she said yes.

The call was then transferred to the Pasadena Police Department (PPD). Dawn told the PPD operator "Um, [unintelligible] I'm at the rest stop, and um, and [unintelligible] and got out of his car and -- and put his, and -- and put his, thing in my face, and he tried to go down my pants [unintelligible] (crying)." Dawn described appellant and his van. She again described what happened: "He got out of his car and -- and um, and um, and -- and tried to put his, um, his thing in my face I'm -- I'm homeless, and I sleep on the bench. And I, and um, and – and um, he tried to, and then he tried [to] pull my pants down and um, and -- and he told me that he was going to fuck me, and -- and rape me, and if I don't get in the car with him then he'll have, um -- um people come over here and rape me."

---

[2]     The jury was given a transcript of the 911 call, but the trial court admonished them the audio on the call was evidence, not the transcript given to them for assistance. The parties relied on only the transcript of the call on appeal, and neither suggests the transcript is materially different from the audio played for the jury. We will also rely on the transcript as accurately reflecting the audio recording of Dawn's 911 call.

3

CHP Officer Edgar Conant was with his partner at the gas station across the street when he heard Dawn's screams for help. He saw a man and a woman in a possible argument, so the officers got into their patrol car and drove to Dawn's location. Officer Conant saw appellant get into his van and drive off. As the officers slowed down in front of Dawn, she pointed toward appellant's vehicle while talking on her cell phone, and they activated the emergency lights and followed appellant. They lost sight of the van for a while, but eventually found it parked unoccupied and, after driving around the block, spotted appellant walking away from where his van was parked. He was "very calm, cooperative" and told the officers the argument was "not a big deal." He said he knew Dawn and was trying to "get her off the streets" and said she had a drug problem. The officers checked appellant's driver's license and let him go. They returned to check on Dawn, and by that point PPD officers were already on the scene with her.

PPD Officer Joshua Jones responded to Dawn's location between 5:00 a.m. and 5:10 a.m., where he found Dawn distraught, crying, and emotional. She described what had happened largely consistent with her trial testimony, although she said she had a blanket over her head so she could not clearly hear appellant call from his van and appellant had offered her $40 to take her to a hotel when he first approached her outside the van, whereas at trial she did not recall either detail. She also told him appellant had threatened to have his friends come and rape her if she did not have sex with him. She described appellant to him.

PPD Sergeant Max Dahlstein also arrived at the scene shortly after Officer Conant and his partner arrived following their encounter with appellant. Sergeant Dahlstein and four PPD officers went to appellant's residence between 6:00 a.m. and 6:30 a.m., after receiving his identifying information from Officer Conant and his partner. Appellant was in bed at the time, and officers directed him outside. Appellant asked what this was about, and Sergeant Dahlstein told him, "I think you know what this is about," to which appellant responded, "Oh, if it was this thing down on Lake Avenue, I already talked to C.H.P. about that. I don't need this drama." Appellant's van was found parked a few houses down from appellant's house. Officer Jones brought Dawn to the scene for a field show-up, and she identified both appellant and his van.

4

Appellant was cooperative throughout the contact.  Sergeant Dahlstein smelled alcohol on appellant's breath but he did not seem to be impaired.  Sergeant Dahlstein testified that in his 21 years of experience as a police officer, he had arrested approximately 1,000 people for being under the influence of alcohol and as part of his job, he dealt with people under the influence of alcohol on a nightly basis.  He testified appellant appeared to understand what was being said to him and he was responding appropriately to questions.  When appellant walked out of his house, Sergeant Dahlstein saw no impairment in his movement.  Although Sergeant Dahlstein smelled alcohol on his breath, appellant "was able to facilitate himself and act in a way that was appropriate to [Sergeant Dahlstein]."

Appellant was detained and taken to the police station, where he was interviewed by Officer Jones three times, once before being placed under arrest and twice after, all of which were recorded and played for the jury.  In the interviews, appellant denied grabbing his penis, unzipping his pants, pulling Dawn's pants down, or soliciting her for sex.  He said he approached Dawn because they had smoked "weed" together and he stopped to help her and give her money.  He said he asked her if she was hungry and she started screaming, so he just left.  He initially told Officer Jones he was "a little drunk" at the time of the incident, but when Officer Jones later mentioned he had said he had been drinking, appellant said, "No -- no," and he had had only one drink or maybe a beer and a "nice and strong" mixed drink at "maybe about midnight," and "I'm not even drunk dude."

After the first interview, Officer Jones called Dawn on her cell phone to verify appellant's statements, and she denied ever meeting him before.  As a result, appellant was arrested for assault with intent to commit rape.

The next morning, PPD Corporal Kim Smith, the detective assigned to the case, interviewed appellant, which was not recorded.  Appellant explained he had been out drinking Saturday night into Sunday morning, having "at least three Jack Daniels and Cokes and beer," when on his way home he saw a woman at the bus stop on Lake Avenue.  He still felt drunk when he decided to approach the woman, whom he thought was a prostitute.  He pulled up next to her and offered her $20 to expose her breast to him, which she accepted.  He came out of his vehicle, sat next to her, and talked about having sex with him, but got

5

nervous when the woman screamed, so he left. When asked whether he had pulled out his penis or pulled the woman's hair, he responded he could not remember, but "[i]t was possible." He also said he did not remember trying to pull down her pants, and he did not think that was something he could do.

At trial, Dawn testified she had a prior conviction for attempted extortion with her daughter's best friend, Timothy Nguyen, and was still on probation at the time of the incident. The defense called Nguyen as a witness, who testified he had known Dawn since he was 16 years old and said she "likes to play the victim when it's convenient," she had "a lots of sides to her," "she's definitely an actress," she was "coldhearted" to him at times, and she was "out to get what she wants."

The defense also called three family friends as character witnesses, who testified they have never seen appellant physically forceful, and it would be out of character for appellant to force himself on a woman for sex.

Appellant testified on his own behalf. On the Saturday night before the incident, he had been out drinking and gambling with his cousin. At approximately 5:00 a.m., he was driving home on Lake Avenue when he noticed Dawn sitting near the Metro Gold Line station smoking a cigarette. He thought she was "prostituting herself" because she smirked at him and lifted her shirt to flash him. He made a U-turn, pulled over, and rolled down his window; she asked how much money he had and he told her $20, which she took from him and sat back down on the bench. He was confused because he thought she would get into his van, so he got out and sat on the bench next to her and asked, "Are you going to suck my dick?" She asked for another $20. She then began screaming and he kept asking if she was going to orally copulate him. Appellant saw the CHP patrol car pulling into a gas station, so he thought he might be caught in a sting operation.

He denied ever touching Dawn's chest area or unzipping his pants and pulling out his penis. That night he wore jeans with buttons in the front instead of a zipper and "[i]t takes a while to button it, . . . if you're not good at it." He also denied ever touching Dawn's hair or trying to pull down her pants, claiming he could not have done so because his right arm was "immobilized" from a surgery on November 30, 2010. He testified he did not intend to

6

force her to orally copulate him without her consent and explained his statement on the 911 call, "I could fuck you right here if you want," was him "figuring out whether I could get my money back or we were going to work something out, really." When he asked for his money back, she started screaming. Frustrated and scared, he got into his van and left. Appellant parked his van because he was scared about getting in trouble for solicitation. When CHP officers found him, he lied about knowing Dawn because he was scared and embarrassed. He went home and slept until the police showed up.

Appellant testified he also lied to Officer Jones at the police station about what happened "[s]o it wouldn't conflict from what I told the [CHP] officers and make it easier for me to go home," and he did not want to get into trouble for soliciting a prostitute, which he knew was a crime. He was also ashamed of what he had done and did not want his parents to find out why he was in jail. He said he told the truth to Corporal Smith about soliciting Dawn for prostitution and giving her $20 for a "flash." According to appellant, during the interview Corporal Smith asked him whether he had had any sexual contact with his younger sister and threatened to have her taken away; she also suggested she had audio or video recordings of appellant's interaction with Dawn. He again denied he was trying to have sex with or orally copulate Dawn without her consent. He was just trying to "get [his] money's worth."

On cross-examination, he admitted lying to officers about knowing Dawn and having met her twice in the past to smoke marijuana. He also admitted he lied when he told CHP officers Dawn had a drug problem and he was trying to get her off the street. In short, he admitted lying to "every police officer that was involved in the investigation of this case."

## DISCUSSION

Appellant argues the jury should have been instructed similar to CALCRIM No. 3426 that voluntary intoxication can negate the specific intent to commit assault with intent to commit rape or oral copulation.[3] But appellant's counsel failed to request an intoxication

---

[3] CALCRIM No. 3426 states: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in

7

instruction, and, as a "pinpoint" instruction, a trial court does not have an obligation to give one sua sponte. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295 (*Verdugo*); *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120.) So appellant argues his counsel violated his federal and state constitutional rights to effective assistance of counsel by failing to request it.

In order to show ineffective assistance of counsel, appellant must show "(1) his . . . trial counsel's representation fell below an objective standard of reasonableness and (2) he . . . was prejudiced (i.e., there is a reasonable probability that a more favorable determination would have resulted in the absence of counsel's deficient performance)." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372, citing, inter alia, *Strickland v. Washington* (1984) 466 U.S. 668, 687; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1252 (*Pensinger*).) Appellant has failed to demonstrate deficient performance, so we need not address prejudice.

As relevant here, "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent" to commit

---

deciding whether the defendant acted [or failed to do an act] with _____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .' or 'the intent to do the act required'>*. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] [Do not consider evidence of intoxication in deciding whether _____ *<insert non-target offense>* was a natural and probable consequence of _____ *<insert target offense>*.] [¶] In connection with the charge of ____ *<insert first charged offense requiring specific intent or mental state>* the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with ____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'>*. If the People have not met this burden, you must find the defendant not guilty of ____ *<insert first charged offense requiring specific intent or mental state>*. [¶] *<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>* [¶] You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to ____ *<insert general intent offense[s]>*.]"

8

the alleged crime.  (§ 29.4, subd. (b).)[4]  A defendant is entitled to an instruction on voluntary intoxication "'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."'" (*Verdugo, supra*, 50 Cal.4th at p. 295; see also *People v. Roldan* (2005) 35 Cal.4th 646, 715, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*).)  "'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*People v. Lewis* (2001) 25 Cal.4th 610, 645.) "Normally, merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction on diminished capacity." (*Pensinger, supra*, 52 Cal.3d at p. 1241; see also *People v. Marshall* (1996) 13 Cal.4th 799, 848 (*Marshall*); *People v. Avena* (1996) 13 Cal.4th 394, 415 (*Avena*).)

Appellant's counsel was not deficient in failing to request a voluntary intoxication instruction because there was not substantial evidence that appellant was intoxicated at the time of the incident.  Appellant testified he had been out drinking and gambling the night before and told Officer Jones he was "a little drunk" when he approached Dawn.  He similarly told Corporal Smith he had "at least three Jack Daniels and Cokes and beer" and still felt drunk when he saw Dawn.  However, he told Officer Jones he had his last drink at "maybe about midnight," which was approximately five hours before he approached Dawn

---

**4**      Section 29.4 states in full:  "(a)  No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  [¶]  (b)  Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.  [¶]  (c)  Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (Formerly § 22, renumbered by Stats. 2012, ch. 162, § 119, eff. Jan. 1, 2013.)

at 5:00 a.m. Dawn was close to appellant at the time of the incident and she did not smell any odor of alcohol on him or hear him slurring his speech. At between 6:00 a.m. and 6:30 a.m., Sergeant Dahlstein did smell alcohol on appellant's breath but did not think appellant was impaired. To the contrary, in Sergeant Dahlstein's significant law enforcement experience with intoxicated people, he perceived appellant understood what was being said to him and appropriately responded to questions. Based on this evidence, no reasonable jury would find appellant was so intoxicated when he approached Dawn that he could not form the specific intent to assault her with intent to commit rape or oral copulation.

Further, even if appellant was intoxicated at the time, there was no evidence at all of the *effect* of his intoxication on his ability to formulate intent the morning of the incident. (*Williams, supra*, 16 Cal.4th at pp. 677-678; *Marshall, supra*, 13 Cal.4th at p. 848; *Avena, supra*, 13 Cal.4th at p. 415.) Thus, substantial evidence did not support giving an intoxication instruction and appellant's attorney was not deficient in failing to request one. Appellant's ineffective assistance of counsel claim fails.

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

10