Filed 12/9/13  P. v. Allred CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C072386 |
| Plaintiff and Respondent, | (Super. Ct. No. CM036242) |
| v. | |
| WILLIAM LOUIS RAY ALLRED, | |
| Defendant and Appellant. | |

Defendant William Louis Ray Allred pleaded no contest to threatening to commit a crime that would result in death or great bodily injury (Pen. Code, § 422; further statutory references are to the Penal Code unless otherwise indicated) and admitted that he personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)).  In exchange, two related counts were dismissed with a *Harvey* waiver.  (*People v. Harvey* (1979) 25 Cal.3d 754.)  Defendant understood that his maximum sentence exposure was 13 years.

Defendant was sentenced to prison for 13 years, consisting of the upper term of three years plus 10 years for the firearm enhancement.  Defendant twice appealed from the judgment, challenging his plea or admission.  His requests for a certificate of probable

1

cause were denied. We granted defendant's request to construe his second notice of appeal as including a request to appeal sentencing issues.

On appeal, defendant contends his trial counsel rendered ineffective assistance at sentencing when he failed to assert the "significant mitigating factors" of defendant's depression, alcoholism, and drug abuse. We affirm.

## FACTS[1]

Defendant, age 38, had been married to his wife, D., for 13 years. On March 29, 2012, defendant became upset with D. regarding a text message he had seen on her telephone. Defendant struck and choked D., who opted to leave the home and to stay at work or with friends. D. would return to the family home each night to have dinner and spend time with her three children.

About three weeks after the March 29, 2012, incident, defendant sent D. a text message stating, " '911 call me. It's [S.]' " (the couple's seven-year-old daughter). D. was unable to call for about two hours. When she called, defendant told her that S. "had broken her arm, and that she had fallen asleep crying, and asking for her mother."

When D. was able to leave work three hours later, she went to the family home to check on her purportedly injured child. When she arrived, defendant told her that S. was asleep in defendant's bedroom. But upon entering the room, D. realized that S. was not in the bed and evidently had not been injured. Defendant had arranged pillows under the covers to make it appear as though a child were sleeping there.

Defendant pushed D. onto the empty bed. When she got up and turned around, defendant was standing between her and the door, holding a .22-caliber rifle. Defendant told D. that their daughter was at a friend's house because he did not want her to witness the incident.

---

[1] Because the matter was resolved by plea, our statement of facts is taken from the probation officer's report.

While pointing the rifle at D., defendant told her that the rifle was loaded with a .22-caliber bullet and that "a .22 caliber bullet would '. . . bounce around in her body and do the most damage.' "

Defendant made four or five threats to kill D. From five to six feet away, defendant fired his rifle at D. He fired three shots, missing D. by three feet, two feet, and less than one foot. Defendant told D. to turn around, but she refused to comply for fear that he would kill her if she turned.

When D. refused to comply with defendant's order, he put the rifle's barrel in his own mouth and then jerked it away before firing a bullet into the ceiling. D. tried to take the gun away from defendant, who became angrier during the struggle. She eventually convinced him to go to the Butte County Mental Health facility.

D. drove defendant to the mental health facility but did not remain with him. He left prior to being admitted. Facility personnel advised the Chico Police Department that defendant had left the facility after claiming he had held his wife hostage at gunpoint. The facility requested a welfare check at defendant's residence.

Later that afternoon, D. arrived at the Chico Police Department and reported that defendant had held her at gunpoint and had fired a rifle at her three times. D. provided a physical description of defendant. A few minutes later, officers located defendant in his car and arrested him for the charged crimes.

After being advised of his constitutional rights, defendant agreed to speak with officers. He said he had woken up that morning and decided to commit suicide because he and D. were having marital problems. He did not believe he could live without her. Defendant borrowed the .22-caliber rifle from a neighbor, falsely claiming it was to " 'get rid of a raccoon.' " Defendant claimed he had never fired a gun before and had " 'watched movies' to learn how to" fire one. Defendant admitted that he had lied to D. in order to "lure her" to the home, because he wanted her to witness him killing himself. He admitted that he had "consciously" obtained the firearm and had willingly telephoned

3

and lied to D. Defendant claimed he intended only to scare D. and not to kill her. He wanted to commit suicide in front of D. so that she could not divorce him. Defendant denied pointing the rifle directly at D. but admitted firing it near her to scare her. Defendant also explained that he wanted the victim to face away from him, not because "he did not want to be facing her when he shot her, as was suggested," but so he could " 'slap her on the ass,' " because he thought it would entice D. to have sex with him.

Defendant acknowledged that, eventually, he calmed down and allowed D. to take him to the mental health facility. However, he left prior to being admitted. Defendant also confirmed the earlier incident related to D. that had occurred three weeks previously. He stated that during the prior incident, "he pushed [D.] on the bed and placed his hand over her throat. He believed [she] was cheating on him. He explained he was not choking [D.], but grabbed her in a 'control hold.' " After finishing the interview, defendant was booked into Butte County jail.

## DISCUSSION

Defendant contends his trial counsel rendered ineffective assistance at sentencing when he failed to assert the "significant mitigating factors" of defendant's alcoholism, depression, and drug abuse. Defendant claims there could be no satisfactory explanation for counsel's omission because defendant was facing the maximum term and the arguments could not have made his situation any worse. Finally, defendant argues the deficient performance was prejudicial because there is "more than a reasonable probability" that he would have received a less-than-maximum sentence. We are not persuaded.

### *Background*

The probation report stated that defendant had been employed steadily from 2007 to 2012, and that he had a prior conviction for battery in 2001 for which he successfully completed his probation.

4

The probation report documented defendant's long history of untreated depression, alcoholism, and drug abuse. When the 38-year-old defendant was age 17, his drunk driving caused an accident in which his cousin was killed. Since that time, defendant has battled depression and has " 'self-medicated' with alcohol." His daily " 'routine' " consisted of " '[w]orking and drinking.' " The routine included consuming a 12-pack of beer daily from 1992 to approximately a month before the incident. The probation officer concluded that defendant suffered from "alcohol abuse."

The probation report indicated that defendant used cocaine weekly from 2001 through 2007. The stress of his dissolving marriage led him to use cocaine in the days prior to the offense.

In his statement for the probation report, defendant described his mental state at the time of the offenses as "really depressed" and claimed he had fallen "into a deep depressing state." Defendant claimed he "didn't know that drinking for 20 years was hiding all the depression that [he] had for so many years." When he became sober, his "depression escalated" to an extent he "could not imagine." On the day of the incident, he was "filled with depression that caused [him] to try to kill [himself]."

The probation report noted that defendant had been participating in counseling for his anger and alcohol issues for three weeks prior to the present incident and was currently participating in counseling. Defendant expressed interest in attending a residential treatment program. He planned to get "all the help" he needed, including therapy, Alcoholics Anonymous, anger management counseling, and domestic violence classes.

The probation report concluded that defendant's gun use made him ineligible for probation except in unusual cases, and this case was not unusual. (§ 1203, subd. (e)(2).) With respect to the crime itself, the report identified four aggravating circumstances: planning, threats of great bodily injury, taking advantage of his position as S.'s father to lure D. to the crime scene, and weapon use. The report identified two mitigating

5

circumstances: lack of a significant prior record, and successful completion of a prior grant of probation.

With respect to the firearm enhancement, the probation report recommended the upper term based on defendant's serious and violent behavior, the serious danger he posed to the victim and the community, and the level of planning that preceded the offense, including the procurement of the weapon and the manipulation of the victim.

At sentencing, defendant's trial counsel argued four mitigating factors: the incident was only defendant's second offense; he resolved the case early; he expressed remorse; and the incident, although serious, was "episodic." Counsel noted that defendant had successfully completed probation on his prior offense. Counsel argued that "aggravation and mitigation are equal," and that defendant should receive a "mid term commitment."

In response, D. testified that the present incident "was not an accident. This didn't just happen. It wasn't a spur of the moment decision clouded by passion or desperation. He has told me for years that if I left him, he would kill me. And if I didn't die and he had to go to jail when he got out, he would come again and again until I was dead. When I left him and I wouldn't change my mind, he began stalking me and he followed and took pictures of me when I left and tracked me with a GPS system on my phone."

D. testified that during the attack, defendant told her to kneel down and turn around. D. refused, telling defendant that if he was going to kill her, he would have to look her in the eyes, something he had not liked to do during his previous assaults. D. explained that in those incidents, defendant had come at her from behind with a strike to the kidney, a hit that had "drop[ped]" D. quickly; or he had strangled her, knowing that she would fight to breathe rather than fight with him. D. predicted: "This isn't over. This whole process has taken [away] his power over me and taken [away] his power over his life and he isn't going to [allow it to] stand. Next time I'm not going to know what hit me. I don't want you to sentence him to 13 years [in the belief that] I think he's going

6

to change. 13 years just gives him a lot of time to plan. I want you to sentence him to 13 years so that I can have a chance to raise my children and give them a chance to grow up and be capable of living without me."

The trial court found that defendant did not have the ability to comply with probation because during the pendency of the case he had violated a protective order by sending materials to D. The court noted that defendant repeatedly fired the gun inside the room and taunted D. to the effect that she would have to watch him commit suicide. The court concluded that if not imprisoned, defendant would be a danger to others.

In selecting the upper term for the criminal threats charge, the trial court found that the crime involved callousness in that defendant (1) told D. she would have to watch him die; (2) said he would use a particular type of ammunition, so that a bullet would rattle inside of her and cause more damage; and (3) lured her to the home with the lie that the child had a broken arm. The court found that D. was particularly vulnerable and that defendant took advantage of a position of trust.

The trial court found in mitigation that defendant had an insignificant prior record, acknowledged wrongdoing at an early stage, had performed well on probation, and had expressed remorse.

The trial court then said it had overlooked an additional aggravating factor: defendant threatened to kill D. four or five times. The court imposed the three-year upper term for the offense.

To determine the proper term for the firearm enhancement, the trial court noted that defendant purchased bullets in advance, selecting the type that would do the most damage, and he fired the gun several times at close range in a room where D. was unable to escape. The court stated: "[I]n light of the number of times that the firearm was discharged, it's close range to the victim, the lie that was perpetrated to get the firearm, and planning to acquire the necessary bullets, and the design to get that particular round to do the most damage to [D.], the Court does find that the upper term, despite mitigating

7

factors discussed here in Court, which the Court did review, the upper term of ten years is the appropriate term."

The trial court went on to explain the sentencing decision by stating that defendant needed "to be committed to the state prison for the maximum period of time to afford the most safety to the victim in this case."

*Analysis*

" ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" [Citation.]' " (*People v. Avena* (1996) 13 Cal.4th 394, 418.)

" ' "[[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citation.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).)

In this case, trial counsel was not asked why he declined to argue the mitigating factors of defendant's alcoholism, depression, and drug abuse. Defendant argues there could be no reasonable explanation for the omission because he was facing the upper term and thus had nothing to lose. But trial counsel is not required to voice every argument that does his client no harm. " 'Trial counsel is not required to make futile objections, advance meritless arguments or undertake useless procedural challenges merely to create a record impregnable to assault for claimed inadequacy of counsel.

8

[Citation.]' " (*People v. Stratton* (1988) 205 Cal.App.3d 87, 97, quoting *People v. Jones* (1979) 96 Cal.App.3d 820, 827.)

Defendant's argument that his alcoholism, depression, and drug use were mitigating factors is based on *People v. Simpson* (1979) 90 Cal.App.3d 919 (*Simpson*), which states that "before sentencing an alcoholic defendant under the [determinate sentencing law], *the trial court must consider the possibility* that his alcoholism is a circumstance in mitigation within the meaning of [California Rules of Court, former] rule 423 [now rule 4.423], and must then weigh this factor along with the other relevant circumstances. [Citation.]" (*Simpson*, at p. 928, italics added.) The case was remanded for resentencing. (*Ibid*.)

This court described *Simpson's* narrow holding as follows: "There the record affirmatively reflected that the sentencing judge considered the defendant's alcoholism to be an aggravating, rather than a mitigating, factor. Reversing, the Court of Appeal *merely held that a trial court must consider the possibility* that a defendant's alcoholism is a circumstance in mitigation." (*People v. Dixie* (1979) 98 Cal.App.3d 852, 855, italics added.)

In *People v. Reyes* (1987) 195 Cal.App.3d 957 (*Reyes*), this court recognized that *Simpson* "does not hold that alcoholism must always be considered as a mitigating factor." (*Reyes*, at p. 960.) Thus, where alcoholism or drug addiction is out of control, the defendant uses that habit as an excuse or explanation for continued criminal conduct, and the defendant shows little incentive or ability to change, the substance abuse habit does not " 'significantly reduce' his culpability for the crime, nor does it make the criminal conduct 'partially excusable.' " (*Id*. at pp. 963-964.)

In this case defendant's depression, self-medicated by alcohol and drug abuse, had been out of control for more than half of his life. Although defendant had participated in counseling for anger and alcohol issues for three weeks prior to the present incident, and he allowed D. to take him to the Butte County Mental Health facility, he ultimately left

9

the facility prior to being admitted, thus demonstrating little, if any, ability to change. (*Reyes*, *supra*, 195 Cal.App.3d at p. 964.) It was not until his interview at the probation department that he expressed interest in residential treatment and getting "all the help" he needed, including therapy, Alcoholics Anonymous, anger management counseling, and domestic violence classes.

Moreover, in his probation interview, the untreated depression was the excuse or explanation for the continued alcohol and drug abuse. Under our decision in *Reyes*, the untreated depression and resulting alcohol and drug abuse do not " 'significantly reduce' [defendant's] culpability for the crime, nor [do they] make the criminal conduct 'partially excusable.' " (*Reyes*, *supra*, 195 Cal.App.3d at pp. 963-964.)

Because a *Simpson*-style mitigation argument would have run afoul of this court's analysis in *Reyes*, there *could be* a satisfactory explanation for trial counsel's failure to make the argument at sentencing. Any claim of ineffective assistance, tenuous though it may be, is more appropriately addressed in a habeas corpus proceeding. (*Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.)

## DISPOSITION

The judgment is affirmed.


                                                      RAYE          , P. J.


We concur:


       BLEASE      , J.


       HULL        , J.